**James E. and Shirley A. ANDERSON et al., Plaintiffs,**

v.

**Barbara THOMPSON et al., Defendants.**

Civ. A. No. 77-C-717.

United States District Court,
E. D. Wisconsin.

Aug. 5, 1980.

John A. Stocking, Petrie, Stocking, Meixner & Zeisig, Milwaukee, Wis., for plaintiffs.

Bronson C. LaFollette, Atty. Gen., and John W. Calhoun, Asst. Atty. Gen., Madison, Wis., for defendant, Barbara Thompson, State Superintendent of Public Instruction.

Michael J. Sachen, City Atty., West Allis, Wis., for the School Bd.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, and DECISION AND ORDER

REYNOLDS, Chief Judge.

This is an action brought pursuant to 20 U.S.C. § 1415(e) to review the special educational placement decision regarding the plaintiff Monica S. Anderson made by the defendant West Allis–West Milwaukee Joint District No. 1 School Board ("West Allis") on August 8, 1977, as modified by the defendant Barbara Thompson, the State

Superintendent of Public Instruction, on October 7, 1977.

Monica, who was born on August 13, 1967, is a child with exceptional educational needs ("EEN's"), see § 115.80, Wis.Stats., who is in need of "special education" as defined in 20 U.S.C. § 1401(16). For the fall of 1972, her parents enrolled her in the St. Francis Children's Activity and Achievement Center ("St. Francis"), which is a private institution devoted to the education of children with special educational needs. During the 1973–1974 school year, Monica attended St. Francis part time and the West Allis public school kindergarten part time. Pursuant to § 115.80, Wis.Stats., a West Allis multidisciplinary team ("M–team") studied Monica and in June 1974 recommended alternative placements for her either in a classroom for the educable mentally retarded ("EMR") with eventual mainstreaming into the regular first grade or in a regular first grade with transitional teacher help, plus a reassessment by a learning disability ("LD") teacher during the 1974–1975 school year. Monica's parents declined the offered placements and continued her enrollment in St. Francis where she remains through the present. In the fall of 1975, however, her parents did consent to a re–evaluation of Monica by a West Allis M–team, which was done between December 1975 and March 1976. A report was filed on March 22, 1976, which identified Monica as having an EEN in the area of speech and language ("SL") and further undifferentiated EEN's, recommended further evaluation of Monica's interactions in a peer group setting following her enrollment in the West Allis public school system, and recommended an interim placement in an SL and an LD program. Following occupational and physical therapy evaluations of Monica and reports on her prepared by a West Allis LD teacher and a West Allis EMR teacher, a supplemental West Allis M–team report was filed on June 10, 1976, which recommended a diagnostic placement for Monica in a West Allis EMR classroom.

The Andersons refused the placement offered for Monica and, pursuant to § 115.81, Wis.Stats., appealed the placement offer to the local school board. They also obtained an independent M–team evaluation of Monica, which team identified her as having EEN's in the areas of speech and language, learning disabilities, and emotional disturbance. Following twenty–one evenings of hearings, the hearing examiner appointed to make a recommendation to the West Allis school board issued a report on July 26, 1977, finding that Monica had a speech and language disability but was not learning disabled, retarded, nor emotionally disturbed, and that the EMR placement was appropriate because it offered all the components necessary for the development of a program appropriate to Monica's individual needs. The hearing officer's report was adopted by the school district on August 8, 1977, and appealed to the defendant Thompson pursuant to § 115.81(7), Wis. Stats.

On October 7, 1977, the defendant Thompson issued her decision finding that Monica had EEN's in the areas of speech and language and learning disability but not in the area of emotional disturbance, and that an EMR placement for Monica would be appropriate although she was not EMR because the program could be tailored to suit her individual needs, but that a diagnostic placement was inappropriate in view of the extensive information about Monica already known to the West Allis school board. Thompson ordered that the West Allis M–team be reconvened with the consent of Monica's parents to develop an appropriate program to meet Monica's needs, and then to recommend an appropriate placement to carry out the program. This action was then commenced by the Andersons pursuant to 20 U.S.C. § 1415(e) for review of the defendant Thompson's decision. As set forth in the complaint, the Andersons' contentions as of the time of filing of the complaint were that the West Allis and Thompson decisions recommended an inappropriate placement for Monica and that St. Francis offered the only appropriate educational opportunity for Monica.

Since November 1977 when the complaint was filed, many things have occurred which affect both the appropriate present educa-

tional placement for Monica and the Andersons' wishes for her. Most significantly, Monica will be thirteen in August 1980 and is therefore eligible for only one more year of schooling at St. Francis. Furthermore, her parents believe that she has reached an age where she must learn to function in a less specialized environment. Thus, it is now the wish of both the plaintiffs and the West Allis school district that Monica should be enrolled in an appropriate program in the West Allis public school system in September 1980. Second, in early 1979, the Court ordered the parties to prepare updated reports and recommendations as to a suitable educational placement and program for Monica, and the parties have now agreed that Monica has EEN's in the areas of speech and language and learning disability and concur in a placement for her in a West Allis public school self–contained/integrated learning disabilities program. Their present dispute as to Monica's program, therefore, is limited to whether she also has an EEN in the area of emotional disturbance and to the details of the program which should be provided for her once the appropriate diagnosis and placement are made. The program dispute includes disagreement over the nature of the transition program from St. Francis to West Allis which should be worked out for Monica. Finally, the Andersons also seek reimbursement for the costs of this action, including their attorney's fees, the costs of the previous hearing before the hearing officer and the appeal to the Superintendent of Public Instruction, and their costs of sending Monica to St. Francis, including both tuition and transportation.

*The Legislative Scheme and the Scope of Court Review*

The threshold issue in this case is the nature of the review which a district court is intended by 20 U.S.C. § 1415(e) to make of a state placement and programming decision for a child with special educational needs, and the nature of the relief which the court is authorized by that statute to provide.

Subchapter IV of Chapter 115 of the Wisconsin Statutes, §§ 115.76–115.895, Wis. Stats., entitled "Children with Exceptional Educational Needs," was enacted in 1973 with full implementation to occur by July 1, 1976, see § 115.895, and is designed to accomplish the identification of and provision of a special education to all children in the State of Wisconsin who have exceptional educational needs. An EEN is defined as a "mental, physical, emotional or learning disability" and includes speech or language disability, emotional disturbance, and learning disability. § 115.76(3). "Special education" means "any educational assistance required to provide an appropriate education program for a child with exceptional educational needs and any supportive or related service." § 115.76(10). Section 115.80(3) provides for the evaluation of any child suspected of having EEN's by a multidisciplinary team appointed by the local school board, provided that parental consent is given. The M–team is responsible for recommending a child for special education and recommending to the school board an educational program fitted to the individual child's needs. § 115.80(3)(d–e). Periodic reexamination of a child with EEN's by the M–team shall occur at least trienially. § 115.80(5). The child's parents may appeal a placement and program decision to the school board, § 115.81(1), and if dissatisfied with the board's decision may appeal it to the state superintendent, § 115.81(7), and then to the state circuit court, § 115.81(8). Section 115.83(4) provides that "[a] special education program may be for the school term, may include a summer program or may be for the school year," and § 115.85 provides that if the school district of residence does not have a suitable program, then a child may be placed in another school district, § 115.85(2)(b), or, if necessary, in a private special education program, § 115.85(2)(c).

The federal Education of the Handicapped Act, P.L. 94–142, 20 U.S.C. § 1401 et seq., was enacted effective October 1, 1977, and is applicable to all states which accept federal funding for the education of handicapped children. It is designed to provide financial assistance to the states for the education of handicapped children and also to assure a free appropriate public educa-

tion to those children. See the legislative history set out in the 1975 U. S. Code Congressional and Administrative News at 1425 et seq. As defined in the federal act, "special education" means "specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a handicapped child, including classroom instruction, instruction in physical education, home instruction, and instruction in hospitals and institutions." 20 U.S.C. § 1401(16). A "free appropriate public education" means a public special education and related services which "are provided in conformity with the individualized education program" required under 20 U.S.C. § 1414(a)(5), see 20 U.S.C. § 1401(18)(D), and defined in § 1401(19). 20 U.S.C. § 1415(b) and (d) set forth the minimal due process standards with which the state educational agencies must comply in making an administrative determination of placement and programming for a handicapped child. Section 1415(e)(2) provides for court review of the state administrative decision:

> "Any party aggrieved by the findings and decision made [during the state administrative proceeding] * * * shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy. In any action brought under this paragraph the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."

The plaintiffs in this action argue that the state administrative proceedings out of which their complaint arose resulted in inappropriate placement and programming for Monica, and they seek to have the court identify Monica's current EEN's, order a placement for her for September 1980 in the West Allis public school system, and devise a suitable program for her. During the hearing held on May 29–June 5, 1980, the plaintiffs presented evidence of Moni-

ca's current educational needs and a special education program devised for her by independent evaluators ("the independent M-team") whom they had hired. The defendants took the position throughout the hearing that this court's role is limited to determining the appropriateness of the defendant Thompson's October 7, 1977, decision in view of the record then before her and to ordering that her decision be implemented or that the action be remanded to her for further administrative proceedings.

■ The legislative history of P.L. 94–142 is not illuminating on the role intended for the court in its review of a state administrative decision, except that it clarified the court's duty to take evidence additional to the administrative record and to reach an independent decision using the standard of the "preponderance of the evidence":

> "(9) The provisions of existing law with respect to judicial action are clarified and strengthened to assure that any party aggrieved by the findings and decision rendered in the due process hearing or the State educational agency review of such hearing shall have the right to bring a civil action with respect to the original complaint and matters relating thereto. * * * [I]n any such action the court shall receive the records of the due process hearing (and where appropriate the records of the review of such hearing), shall hear additional evidence at the request of any party, *shall make an independent decision based on a preponderance of the evidence and shall grant all appropriate relief.* * * *" (Emphasis added.) 1975 U.S.Code Congressional and Administrative News, at 1503.

The federal regulations implementing P.L. 94–142 merely provide that a party aggrieved has a right to bring a civil action. 45 C.F.R. § 121a.511. Since the matter which the Court is reviewing, however, is the state placement and programming decision, then of necessity § 1415(e) must intend that a court exercise its independent judgment in arriving at an appropriate placement and programming decision. Its role is not to affirm or reverse a state administrative de-

cision, nor even to remand with instructions, but rather itself to come to a decision as to the appropriate placement and programming to carry out the mandate of the federal Act. That being so, there would be little purpose served by freezing the evidence at the moment in time when the final state administrative decision was rendered. In view of the rate at which any child's needs may change, there would be little purpose served by a court proceeding which refused to take into account current evidence of the child's needs.

In this case almost three years have passed since the defendant Thompson's decision was issued and the plaintiffs filed their federal complaint. The delay in bringing the complaint to trial was occasioned in part by the court's calendar, in part by jurisdictional issues raised by the defendants, which issues were brought on for hearing three times by motion, and in part by the parties' efforts to resolve their differences which resulted in an anticipated settlement in the spring of 1979, which settlement was ultimately not concluded. Monica was ten years old when the complaint was filed, and she will soon be thirteen. Both the state and federal acts mandate that a handicapped child receive a special education tailored to meet her individual needs. 20 U.S.C. § 1415(e) imposes on the federal courts, if an appeal is taken, the ultimate responsibility for assuring that a suitable special education is provided. Without considering such current evidence of the child's needs as the parties choose to offer, the court would be unable adequately to meet that responsibility. Thus, in this case all of the evidence presented during the state administrative hearing and all of the evidence presented in this action during May and June 1980 will be considered as it bears upon Monica's current needs and the suitability of a current educational placement and program for her.

*Monica's Current Exceptional Educational Needs*

Since at least 1976 the parties have agreed that Monica has an EEN in the area of speech and language and that an appropriate special education for her would include programming to meet that need. The hearing officer appointed by the West Allis school board to hear the Andersons' appeal of the 1976 West Allis M–team recommendations did not find an EEN in the area of learning disability. The defendant, Thompson, however, in her October 7, 1977, decision did make a finding that Monica has an EEN in the area of learning disability, and she ordered the West Allis school district to devise a suitable program for Monica to meet that need. As of April 1979, West Allis was prepared to offer Monica a placement in a self–contained/integrated learning disabilities program within the West Allis public school system. The evidence at the May and June 1980 hearing established that Monica still has EEN's in the area of SL and LD and that any program devised for her must meet those needs.

Still at issue between the parties is whether Monica has an EEN in the area of emotional disturbance ("ED"). The independent M–team hired by the Andersons in the fall of 1976 concluded that Monica did have an EEN in the area of ED. The West Allis M–team and the hearing officer concluded that she did not. The defendant Thompson in her October 7, 1977, decision found that Monica did not have an EEN in the area of ED but that she did display "disturbing behaviors" which the educational programming developed for her must take into consideration "if development of a further handicapping condition in the area of emotional disturbance is to be avoided." (Decision and order at 12.)

In its 1979 and 1980 reports, the independent M–team reaffirmed its previous conclusion that Monica has an EEN in the area of ED, and team members testified during the 1980 federal court hearing that even were Monica's SL and LD problems resolved, she would continue to have an EEN in the area of ED. According to their testimony, it is unclear whether Monica's EEN in the area of ED was caused by or arose independent of her other handicapping conditions, but regardless of cause, the ED handicap is sufficiently severe at the present time to require individualized programming and treatment.

The defendant Thompson did not present any evidence during the federal court hearing, having taken the position that she was a nominal defendant only and not involved in making a current evaluation of or developing a current placement and program for Monica.

West Allis presented some evidence in support of its 1976–1977 finding that Monica at that time had no EEN in the area of ED, and it examined the conclusions of plaintiff's witnesses that Monica currently has an EEN in the area of ED, but it did not present witnesses on Monica's present emotional status. That omission is not attributable to any error or fault on the part of the school district. Section 115.80, Wis. Stats., precludes any school district's M-team evaluation of a handicapped child without parental consent. Thompson on October 7, 1977, ordered that the West Allis M-team be reconvened "*with parental consent* and cooperation for the purpose of fully determining Monica Anderson's exceptional educational needs and developing recommendations and goals to meet those needs," (emphasis added) (decision and order at 14), and the Andersons did not consent, thus precluding further evaluation of Monica by the West Allis M-team. In January, 1979, this Court ordered the parties to prepare updated evaluations and program recommendations for Monica but prohibited psychological testing. According to the testimony of the school board's witnesses, without psychological testing of Monica they could not satisfactorily evaluate her EEN's and thus could neither confirm nor deny that as of April 1979 she had an EEN in the area of ED.

There is no dispute that Monica is a child with unusually complex needs, nor that one of those needs is in the area of social/emotional disturbance. Thompson in her decision criticized the parties for putting an undue stress on labelling * at the expense of individual programming for Monica, and at the present time as well the Court is not satisfied that the dispute over EEN's is significantly more than a labelling dispute. The West Allis witnesses testified that there would be little difference in the program developed for Monica if she were labeled emotionally disturbed or merely treated as displaying "disturbing behaviors." Furthermore, the school district's attorney stated during the hearing that the district anticipated in 1976 that Monica might develop an EEN in the area of ED, and, thus, if its M-team had the opportunity to do current psychological testing on Monica, a finding that she has done so would be unsurprising. The plaintiffs' witnesses stated that a suitable educational program cannot be developed for a handicapped child unless the handicapping conditions are first accurately identified, but they did not set forth any significant programming differences which would result were Monica labelled as ED or, in the alternative, as having social/emotional problems which result in disturbing behaviors but do not rise to the level of an exceptional educational need. West Allis in its educational program prepared in June 1980 has already planned to include as a resource person for Monica a teacher with ED licensing, and it is the Court's understanding that all parties view the function of the ED resource person as being regularly available for consultation with Monica's LD teacher and not as having regular classroom contact with Monica herself. The plaintiffs do not wish to have Monica based in an ED as opposed to an LD classroom.

■ To the extent that the specific identification of exceptional educational needs is significant, the Court is satisfied, based upon a preponderance of the evidence

---

* A central dispute between the parties in 1976–1977 was whether Monica should be placed in a learning disabilities classroom or a classroom for the educable mentally retarded. West Allis did not consider Monica to be either EMR or LD. Her parents contended that she was LD. West Allis took the position that Monica's social/emotional needs could best be treated in the context of an EMR classroom, whereas her parents contended that placing her in a classroom with retarded children would have a devastating impact on her self image and development. Thompson found that an EMR placement would not have a devastating impact on Monica, and she also made the point that Monica's individual needs should not be lost sight of in a dispute over the correct labelling of her handicaps.

presented during the 1980 hearing, that Monica does currently have an EEN in the area of emotional disturbance. The significance of this finding for purposes of providing appropriate relief is that the minor differences in recommended programming which resulted from the parties' differing identifications of Monica's EEN's have been resolved in favor of programming designed to place more rather than less emphasis on the handicap of ED. Specifically, the educational program prepared for Monica by West Allis in June 1980 has been modified to incorporate the long term objectives and short term goals in the areas of emotional and social skills set forth at pages. 65–66 and 67–69 of the 1980 independent M–team report.

*Placement and Programming for Fall of 1980*

This court's duty under 20 U.S.C. § 1415(e) to review the evidence and grant "appropriate" relief requires at a minimum that it assure to Monica a "free appropriate public education" for the fall of 1980 within the West Allis public school system, which education conforms to the requirements of both state and federal law for the provision of special education to handicapped children. The parties are currently in agreement that a placement for Monica in the learning disabilities classroom at the Frank Lloyd Wright Junior High School would be appropriate and that the school district will provide her with transportation between home and school once she is enrolled full time in West Allis. They do not agree on all of the details of the program which should be instituted for her.

20 U.S.C. § 1401(18) defines a free appropriate public education as:

"* * * special education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program re-

quired under section 1414(a)(5) of this title."

"Individualized education program" is defined in 20 U.S.C. § 1401(19) as:

"* * * a written statement for each handicapped child developed in any meeting by a representative of the local educational agency * * * the teacher, the parents or guardian of such child, and, whenever appropriate, such child, which statement shall include (A) a statement of the present levels of educational performance of such child, (B) a statement of annual goals, including short–term instructional objectives, (C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs, (D) the projected date for initiation and anticipated duration of such services, and (E) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis whether instructional objectives are being achieved."

See also 45 C.F.R. § 121a.340–121a.349. Under § 121a.342, an individualized education program ("IEP") was required to be in effect by October 1, 1977, for every child then receiving special education services, and thereafter it must "[b]e in effect before special education and related services are provided to a child."

In the past the plaintiffs have been unwilling to accept any program suggested for Monica by the school district because of the failure of the district to develop an IEP for Monica. The 1976 West Allis M–team report recommended a diagnostic placement for Monica and did not contain an education program. The 1979 West Allis M–team report did contain an education program which set forth long–term goals, but it did not contain a statement of short–term instructional objectives nor a statement of objective criteria and evaluation procedures for determining whether instructional objectives were being met.

The omission in the West Allis reports stems from the differing requirements of

state and federal law. As stated above, IEP's were required under federal law only as of October 1, 1977. When the 1976 West Allis report was written, therefore, West Allis was under no obligation to include a statement of short–term goals. As of 1979, when the second West Allis report was written pursuant to court order, the Wisconsin and federal programming requirements were in conflict. Section 115.80(3)(e) provides:

> "If the multidisciplinary team recommends a child for special education, it shall also recommend to the school board an educational program fitted to the individual child's needs. * * * "

The implementing regulation, Wisconsin Administrative Code PI 11.33(2), provides, however:

> "(2) THE STUDENTS' INDIVIDUAL EDUCATIONAL PROGRAM (IEP).
>
> "Each LEA shall establish or revise an IEP for each exceptional child pursuant to Section 115.80(4), Wis.Stats. This shall occur at an individual planning conference prior to the beginning of each school term for continuing students *or within six weeks of initial placement for new students.* * * * " (Emphasis added.)

Thus, under state law West Allis had no obligation to provide an IEP for Monica until six weeks after the start of her first public school term. While 20 U.S.C. § 1414(a)(5) conditions the state's receipt of federal funds on the establishment of an IEP for every handicapped child at the start of each school year, the Department of Health, Education, and Welfare has extended to July 1, 1980, the date by which local educational agencies in Wisconsin must comply with the federal Act's IEP requirements. (Exhibit 38.)

Since the Court does not view its function in this case as one of allocating blame among the parties for their past inabilities to agree on an education program for Monica, the present significance of West Allis' past omission to write short term instructional objectives and evaluative criteria for Monica lies only in its effect on West Allis' ability to comply now with the federal requirement that an IEP for Monica be in effect prior to the commencement of the 1980–1981 school year. Mr. Robert J. Buehler, the Director of Special Education in the defendant school district who is responsible for placement offers, testified on June 5, 1980, that the 1980 independent M–team report does contain the rudiments of a current IEP for Monica, lacking only an identification of the persons who will provide services to Monica and will evaluate her and a description of the materials which will be used. Additionally, there was testimony at the hearing that teachers at St. Francis periodically write out statements of short–term goals for Monica, the most recent of which were to have been completed by the end of June 1980.

During the hearing on June 5, 1980, the Court notified the parties that it had concluded that an IEP containing detailed short–term instructional objectives must be written for Monica prior to the start of the 1980–1981 school year and that the obligation to establish the IEP lies with the school district. It notified the school district that either the district could use the 1980 independent M–team report and available St. Francis statements to draft an IEP, or it could nominate a special master to draft an IEP. West Allis elected to draft an IEP using the available materials, and the draft was submitted to the Court on June 13, 1980. During a conference held on July 7, 1980, the plaintiffs presented their objections to portions of the draft IEP. (See Exhibits 45, 46, and 47.)

Having now studied the submissions and considered the comments of the parties, the Court has resolved their differences in the manner which it finds most appropriate to Monica's current needs, giving due regard to its finding that Monica has an exceptional educational need in the area of emotional disability. The area of transition is dealt with below. The basic program content otherwise remains unchanged, although certain minor modifications such as the inclusion of evaluative criteria and designation of maximum class size have been added at the plaintiffs' suggestion and with the consent of West Allis. With regard to a number of program areas, the plaintiffs have suggested that the 1980 independent M–

team long–term goals and short–term instructional objectives be substituted for the West Allis goals and objectives, and the court in most instances has adopted plaintiffs' suggestion for the primary reason that the independent M–team goals and objectives were written with the aid of the St. Francis staff and therefore reflect a greater familiarity with Monica's current educational status and her probable rate of academic achievement than West Allis has had the opportunity to develop.

Attached as an appendix to this decision and order is an IEP for Monica for the fall of 1980, ▪ which IEP the school district is ordered to offer to Monica as a program for fall 1980 in conjunction with an offer of placement in the self–contained/integrated learning disabilities classroom at the Frank Lloyd Wright Junior High School. The Court considers that these program and placement offers will satisfy the school district's obligations under both state and federal law to provide Monica with an appropriate special education for the fall of 1980, and if Monica's parents refuse the program and placement offers, then the obligations of the school district to Monica for the coming school year are at an end.

*Transition and Summer School*

Among the most difficult issues raised during the hearing in this action was that of the obligation, if any, of the school district to provide Monica with a summer school program. The plaintiffs contend that Monica and many other children with EEN's require continuity in their education to prevent academic regression, which can be more severe in the case of a handicapped child, particularly one with a learning disability, when studies are interrupted for a prolonged period of time than it is in the case of a nonhandicapped child. In addition, the plaintiffs contend that the probability of a successful transition for Monica from St. Francis to the Frank Lloyd Wright Junior High School will be substantially increased if she gains some familiarity prior to the commencement of the school year with the Frank Lloyd Wright facilities, the staff, and her future classmates. Their ideal program for Monica would be a four to six week, three hour per day academic program in the LD classroom at the Frank Lloyd Wright School, also attended by some of the other students who will be in the LD classroom in the fall. In the alternative, if the Court finds that the school district is not obligated to provide a summer school program at the school, the plaintiffs suggest that it be ordered to provide Monica with private tutoring or to pay her tuition and transportation costs at the St. Francis summer school program in conjunction with allowing the plaintiffs access to the Frank Lloyd Wright Junior High School so that they can familiarize Monica with the school facilities.

▪ There is no explicit requirement under either state or federal law that a summer school program be provided to children with exceptional educational needs. Section 115.83(4), Wis.Stats., does recognize that a special education program "may include a summer program," and "special education" as defined in 20 U.S.C. § 1401(16) is "specially designed instruction * * * to meet the unique needs of a handicapped child * * *." In *Armstrong v. Kline*, 476 F.Supp. 583 (E.D.Pa.1979), the Court found that children who are severely and profoundly impaired by mental retardation and severely emotionally disturbed children may require year–round education to prevent a serious loss of skills and development which would otherwise occur during a break in educational programming and could not be quickly recouped once educational programming was resumed. The Court also found that some of those children will benefit from "exposure to what lurks outside the institution," 476 F.Supp. at 599, and consequently that in some cases academic breaks may be beneficial, the duration of the breaks varying depending upon the needs of the individual child. The Court concluded that an "appropriate education" within the meaning of the federal Education of the Handicapped Act may include educational programming of longer duration than that routinely made available to nonhandicapped children:

" * * * Equality of services and programs is not the test for determining whether an appropriate education is being provided by the state. The Act explicitly, in a number of instances, requires that the state provide services to handicapped children that it does not give to non–handicapped children, e. g., hospital and home instruction, see 20 U.S.C. § 1401(16), and also instructs, without mentioning the services provided to normal children that an educational plan be developed on an individual basis with attention paid to the handicapped child's needs. It is apparent that Congress recognized that 'equal' services does not always provide handicapped children with an 'appropriate education' and, thus by requiring defendants to meet the handicapped child's 'unique needs', demanded that, in certain instances, more be provided." 476 F.Supp. at 605.

This Court finds the reasoning in the *Armstrong* decision persuasive and entirely consistent with the language of the federal Act and, therefore, concludes that a free appropriate public education may in some cases include year–round educational programming. Whether it does in a particular case will vary with the needs of the particular child, but where it is required, then federal law imposes on the local educational unit wherein the child resides the obligation to provide such an education.

The evidence presented during the hearing in this case established the following facts with regard to Monica's need for and the availability of a summer school program: The defendant school district has never had a summer school program for any of the attending children, whether handicapped or nonhandicapped, except for a driver's education program. Until the 1980 independent M–team report was filed, no suggestion had been raised that it provide Monica with a summer school program. The district teaching staff is already on leave for the summer. Monica herself has never attended a summer school program at St. Francis or elsewhere due to her parents' inability to pay the costs of a summer school program. Since July 1979, however, continuing through the present, she has had two hours per week of private speech and language tutoring. A break in her academic programming, whether occasioned by vacations or teacher absence, does result in a temporary disruption of Monica's academic progress, and she would benefit from continuity. She has, however, continued to progress academically from year to year despite the lack of summer school programming. Furthermore, she is now at an age where she must learn to adjust to changes, and, therefore, according to the consensus of the experts who testified, she does not require a summerlong program but at most a four to six week half–day program which should include math, reading, and speech and language therapy.

In view of Monica's history of continuous educational progress, the Court finds that in order to provide her with a free appropriate public education, West Allis is not at the present time obligated to provide her with a summer school program. Year–round programming is certainly not required. Monica is a child who will benefit from exposure to the outside world and who will not suffer irreparable loss of progress during a break in her educational programming. The evidence presented during the hearing on her current academic needs established that she does suffer some academic regression during a break in educational programming and would benefit from a four to six–week program during the summer, and particularly during this summer since the stress that will be imposed on her in the fall by entering a new academic environment may delay her normal recoupment of her academic skills. Nevertheless, the Court is not persuaded that her academic regression will be so much more severe than that of a nonhandicapped child during a summer vacation that programming of a longer duration than West Allis provides for a nonhandicapped child is required in order to provide Monica with an appropriate education. In this instance, "equal" services, see 476 F.Supp. at 605, meaning equal in length of time provided, will satisfy the requirements of both state and federal law. Therefore, West Allis will not be ordered to provide Monica with a summer

school program. While attendance at a summer school program within the Frank Lloyd Wright Junior High School would aid the process of Monica's transition from St. Francis to the public school system, the Court is not persuaded that such a program is essential to a successful transition. Access to the Frank Lloyd Wright Junior High School on an informal basis can be provided by the school district during the summer and should adequately serve the purpose of familiarizing Monica with what will be her new surroundings.

As for the transition itself once the school year commences, the plaintiffs contend that Monica should attend St. Francis half–time and the Frank Lloyd Wright Junior High School half–time for a period of time, the length of which should be determined by Monica's reaction to the public school. Their estimates of that period range from several months to a year. The plaintiffs also contend that Monica, because of her difficulty in establishing new relationships, should be accompanied to the public school by someone whom she knows and trusts and who relates to her in an educational capacity for as long as it takes her to form new relationships at the public school. They suggest that someone from St. Francis be designated to fulfill this function.

West Allis is opposed to the idea of having someone from St. Francis accompany Monica to the public school and is also opposed to having Monica continue part–time at St. Francis until her public school adjustment is complete. On the other hand, West Allis has not made a final educational determination that Monica will be able to attend the public school full–time as of the commencement of the school year. Instead, West Allis' approach to the transition period is as follows:

> "The length of Monica's school day will be determined by her adjustment to and tolerance for the public school setting. For example, Monica may start on an amended school schedule to be altered as deemed appropriate by school personnel, parents, and student." (Item 6 on page 7 of Exhibit 45.)

No provision is made in the West Allis transition statement for what will become of Monica for the remainder of a school day if it is determined that an amended school schedule is in fact desirable, i. e., whether she will be sent home, returned to St. Francis, or given some form of private tutoring to compensate for the missed academic hours.

Based upon a preponderance of the evidence presented during the hearing in the action, the Court makes the following findings of fact with regard to the transition of Monica from St. Francis to the West Allis public school system: Monica is a child who has difficulty in adjusting to new environments and new people, and a forced transition for which she is not adequately prepared could have a serious negative effect on her academic and social/emotional status. On the other hand, she must learn to adjust to new environments and new people, and it is therefore desirable that the period of transition be as brief as is consistent with a successful adjustment. It is not possible to determine what the length of the transition period should be until it has begun and Monica's reaction to the public school can be evaluated. If it should be determined, however, after the school year has begun that Monica cannot cope with a full academic day at the public school, it is also undesirable that her academic needs be sacrificed to the exigencies of the transition period.

■ The only feasible option which the Court perceives in order to accommodate Monica's academic needs and her need for a successful transition is to have Monica continue at St. Francis half–time in September and commence attendance at the Frank Lloyd Wright Junior High School half–time in September, with an assessment of her adjustment to be made shortly after the school year begins by West Allis in consultation with Monica's parents and the St. Francis staff. If at that time Monica is adjusting well to the public school, she should commence attendance full–time at the public school. If not, the half–time arrangement should continue with periodic re–evaluations of Monica's progress in adjustment for as long as is necessary to assure a successful transition. Since West

Allis has the legal responsibility to provide Monica with a free appropriate public education, it also has the ultimate responsibility for determining when she will be able to attend the public school full–time. That decision should not be made alone, however, but rather with input from Monica's parents and the St. Francis staff.

■ There are two subsidiary matters. First, while Monica might benefit from being accompanied to the public school by a member of the St. Francis staff and her period of adjustment might as a result be significantly shorter, the Court has no authority to order a staff member from a private educational institution, such as St. Francis, to undertake that obligation, and, therefore, this aid to transition is not an available form of relief. Second, since the Court finds that Monica's half–time attendance at St. Francis is essential to the success of the special education program which is being offered to her by West Allis, if Monica's parents accept the offered program and placement, then West Allis must pay the costs of Monica's transportation to and from and her tuition at St. Francis during the transition period. The Court views Monica's attendance at St. Francis for whatever period of time is required in the fall of 1980 as being in the nature of a supportive service which is required to assist Monica to benefit from the special education provided to her by West Allis. See 20 U.S.C. § 1401(17). The Court recognizes the conflict thereby imposed on West Allis, which has both the obligation to pay Monica's expenses at St. Francis and the duty to decide when she no longer needs to attend St. Francis. The Court is satisfied, however, that West Allis will act in this regard in good faith and with Monica's best interests in mind and will not force the pace of the transition period if Monica turns out to be unprepared for a fast adjustment to the public school.

The details of the transition program are set forth in the IEP attached as an appendix to this decision.

*Costs*

Claiming that the defendant school district has been aware since 1972 of Monica's status as a child with exceptional educational needs and since that time to the present has failed to offer her an appropriate educational placement and program, the plaintiffs seek in this action to recover from the school district their costs of providing Monica with a private education and their costs, both administrative and judicial, of obtaining an appropriate public school program and placement offer for her. Their claimed items of costs are set forth in Exhibit 44 and include transportation to and tuition at St. Francis, attorney's fees at both the administrative and judicial levels, the 1979 and 1980 independent M–team fees, and such items as postage, photocopying, babysitting for evening administrative hearings, and parking fees. The sum total of the amounts claimed through June 13, 1980, is $25,701.51, not including $499 for Monica's 1979 summer tutoring.

Beyond stating that a court "shall grant such relief as the court determines is appropriate" in an action of this type, 20 U.S.C. § 1415(e)(2), the federal Education of the Handicapped Act is silent on the matter of awarding damages, costs, or attorney's fees to a prevailing party. The regulations are also silent except that 45 C.F.R. § 121a.506(c) provides that if a state administrative hearing is commenced, "[t]he public agency shall inform the parent of any free or low–cost legal and other relevant services available in the area * * *."

■ It is the American rule that a prevailing party is not entitled to an award of attorney's fees except where specifically authorized by statute. There is no specific authorization in the federal Education of the Handicapped Act, and the above–quoted regulation suggests that the omission was not an oversight but rather an intended omission and, consequently, that an award of fees was not part of the congressional scheme.

■ There are a few exceptions to the American rule, most notably where the losing party has acted in bad faith, *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 258–259, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975); *Roadway Express,*

*Inc. v. Piper*, —— U.S. ——, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980), and in such cases the courts, in their discretion, may allow attorney's fees. The defendant school district has not acted in bad faith. The administrative record establishes that it offered a diagnostic placement for Monica in 1976 rather than an educational program because in the opinion of its special education employees Monica was a child with unusually complex needs which could not adequately be diagnosed and programmed for by the school district until she was enrolled in the district and had been under observation for some period of time. Barbara Thompson found that the district should have made a greater effort to observe Monica at St. Francis and that with such effort it could have obtained sufficient information to devise a suitable program for her prior to her entry into the public school system. That finding, which the Court adopts based upon a preponderance of the evidence in the administrative record, does not establish bad faith. The Court also finds that the school district has acted, and continues through the present to act, with Monica's best interests in mind, although it has not always done all that it might to further those interests and to meet its obligations under state and federal law.

The plaintiffs also suggest that an award of attorney's fees would be appropriate under a "private attorney general" theory. They argue that the purposes of the federal Education of the Handicapped Act are so important, and the number of persons who have the perseverance to maintain a judicial action to vindicate those purposes so few, that the plaintiffs should be compensated for their attorney's fees because the beneficial effects of their actions will extend beyond Monica to many other children who suffer from handicapping conditions. Even granting the plaintiffs' premise, however, the Court has no authority to make an award of fees under these circumstances. It is instead for Congress to determine the enforcement of which federal statutes should be encouraged through the allowance of attorney's fees to a prevailing party:

"* * * Since the approach taken by Congress to this issue has been to carve out specific exceptions to a general rule that federal courts cannot award attorneys' fees beyond the limits of 28 U.S.C. § 1923, those courts are not free to fashion drastic new rules with respect to the allowance of attorneys' fees to the prevailing party in federal litigation or to pick and choose among plaintiffs and the statutes under which they sue and to award fees in some cases but not in others, depending upon the courts' assessment of the importance of the public policies involved in particular cases. * *" *Alyeska Pipeline Service Co. v. Wilderness Society*, supra, 421 U.S. at 269, 95 S.Ct. at 1627.

See also *Runyon v. McCrary*, 427 U.S. 160, 185–186, 96 S.Ct. 2586, 2602, 49 L.Ed.2d 415 (1976).

As is also established in *Alyeska*, attorney's fees and items of costs, except those specifically allowed by 28 U.S.C. § 1920, may not be awarded as items of damages in a case where the plaintiffs are entitled to recover damages. 421 U.S. at 253–254, 95 S.Ct. at 1620. The plaintiffs have not sought to recover damages per se arising out of the denial to Monica of an appropriate placement and program. Even were some of the items which they denominate as "costs" in Exhibit 44 recoverable as damages, however, they would not be entitled to them. There is no indication in the legislative history of the federal Education of the Handicapped Act nor in the Act itself that Congress intended to create a private cause of action for damages, and absent some more explicit authority than the phrase that the court "shall grant such relief as the court determines is appropriate," there is no basis for reading into the Act such a private cause of action. Section 1415 is aimed at establishing procedures to obtain an appropriate placement and program for a child with exceptional educational needs and not at compensating the child for past deficiencies in the provision of a special education. See *Loughran v. Flanders*, 470 F.Supp. 110 (D.Conn.1979).

The final question presented is whether the plaintiffs are "the prevailing party" within the meaning of Rule 54 of the Federal Rules of Civil Procedure and therefore entitled to recovery of the standard items of costs allowed by 28 U.S.C. § 1920. Because the plaintiffs have substantially prevailed on the issues in dispute between themselves and the defendant school district, the Court concludes that they are entitled to such costs from the school district. The Court has accepted the plaintiffs' theory of the scope of judicial review under 20 U.S.C. § 1415, it has found that Monica Anderson currently has an exceptional educational need in the area of emotional disturbance, it has accepted many of the plaintiffs' proposed modifications to the West Allis IEP, it has found that a "free appropriate public education" may include a summer school program although Monica does not currently require one, and it has found that a successful transition for Monica from St. Francis to the public school must include a period of partial attendance at St. Francis. Only on the issue of the items taxable as costs have the plaintiffs not substantially prevailed.