658 F.2d 1205
 63 A.L.R.Fed. 197
 James E. ANDERSON and Shirley A. Anderson, individually and
as parents of Monica S. Anderson, Plaintiffs-Appellants,
v.
Barbara THOMPSON, as State Superintendent of Public
Instruction, and the West Allis-West Milwaukee
Joint District No. 1 School Board,
Defendants-Appellees.
 No. 80-2364.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 26, 1981.
Decided Sept. 8, 1981.
 
 Robert Burns, Chicago, Ill., for plaintiffs-appellants.
 Michael J. Sachen, City Atty., West Allis, Wis., Daniel D. Stier, Dept. of Justice, Madison, Wis., for defendants-appellees.
 Before SWYGERT, Senior Circuit Judge, SPRECHER, Circuit Judge, and THOMAS, Senior District Judge.*
 SWYGERT, Senior Circuit Judge.
 
 
 1
 At issue in this appeal is whether the district court, in reviewing a state administrative decision regarding the special education program for a handicapped student under the Education for All Handicapped Children Act (EAHCA), 20 U.S.C. § 1415(e)(2), properly declined to award compensatory damages and attorney's fees. 495 F.Supp. 1256 (1980). We hold that Congress, though including within the EAHCA a private right of action which authorizes district courts to award appropriate relief, did not intend to provide an award of money damages in the absence of exceptional circumstances. We also hold that plaintiffs cannot recover attorney's fees because this action is not cognizable under 42 U.S.C. § 1983 and because the EAHCA does not provide for attorney's fees. Accordingly, we affirm the judgment of the district court.
 
 
 2
 * Monica Anderson, a Wisconsin resident and daughter of plaintiffs-appellants James E. and Shirley A. Anderson, has been diagnosed as a child with exceptional educational needs, requiring under the EAHCA, 20 U.S.C. § 1401(16), a specially designed education tailored to meet her unique needs. She is now thirteen years old and for most of her education has been enrolled in a private school at her parents' expense. The instant dispute stems from plaintiffs' refusal to accept the placement decision of defendant-appellee State Superintendent of Public Instruction Barbara Thompson. Under the EAHCA, 20 U.S.C. §§ 1401 et seq., a state receiving federal funding for education must provide a "free appropriate public education," 20 U.S.C. § 1412(1), that meets the needs of a child diagnosed as having exceptional educational needs.[1]
 
 
 3
 The plaintiff-parents brought action in the district court pursuant to section 615(e)(2) of the EAHCA, 20 U.S.C. § 1415(e)(2), challenging the educational program offered by the state and requesting the court to determine an appropriate program for Monica. They also sought as money damages the costs of their daughter's private education and their administrative appeals as well as the costs of this judicial action and attorney's fees. Plaintiffs here appeal from the district court's refusal to grant damages or attorney's fees despite the fact that the plaintiffs were found to be the prevailing parties.
 
 
 4
 Monica began her education at St. Francis Children's Activity and Achievement Center (St. Francis), a private institution devoted to the education of children with special educational needs. She attended the school full-time during the 1972-73 school year and the following year, attended St. Francis and a West Allis public school kindergarten each on a part-time basis. Under Wisconsin law, a child must be tested if there is a reasonable chance to believe that the child has exceptional educational needs. Monica was examined by a West Allis multi-disciplinary team (M-team), skilled in assessing needs for special education. In June 1974, the M-team recommended alternative placements for her, either in a classroom for the educable mentally retarded with eventual mainstreaming into the regular first grade, or in a regular first grade class with transitional teacher help plus a reassessment by a learning disability teacher during the 1974-75 school year. Plaintiffs declined that placement and decided to enroll her exclusively at St. Francis.
 
 
 5
 In the fall of 1975 plaintiffs consented to a reevaluation by the M-team. The team studied her over a period of four months and filed a report in March 1976 which identified Monica as having exceptional educational needs in the areas of speech and language and further undifferentiated exceptional educational needs. In June a supplemental West Allis M-team filed a report consisting of occupational and physical therapy evaluations and reports prepared by West Allis special education teachers. The supplemental report recommended a diagnostic placement for Monica in a West Allis classroom for the educable mentally retarded.
 
 
 6
 The Andersons again refused the recommended placement and continued to send Monica to the private school. They obtained an independent M-team evaluation of their daughter which diagnosed her as having needs in the areas of speech and language as well as learning disabilities and emotional disturbance. Pursuant to Wis.Stat. § 115.81, they appealed the recommended placement to the local school board. After twenty-one evenings of hearings, the hearing examiner issued a report to the West Allis school board concluding that Monica had a speech and language disability but was neither learning disabled, retarded, nor emotionally disturbed. He determined that the educable mentally retarded placement was appropriate because it offered all of the components necessary for the development of a program meeting her individual needs. The hearing officer's report was adopted by the school board.
 
 
 7
 Plaintiffs next appealed to State Superintendent Thompson pursuant to Wis.Stat. § 115.81. On October 7, 1977 Thompson issued her decision finding that Monica had exceptional educational needs in the areas of speech and language and learning disabilities but that she was not emotionally disturbed and that an educable mentally retarded placement was appropriate. Thompson stated that she made the placement recommendation despite the finding that Monica was not educably mentally retarded because that program could be developed to meet her individual needs. She also recommended that the West Allis M-team be reconvened with the consent of plaintiffs to develop further an appropriate program. The Andersons refused both the placement and further testing; they continued to send their daughter to St. Francis.
 
 
 8
 Plaintiffs commenced the instant action pursuant to 20 U.S.C. § 1415(e)(2) seeking review of Thompson's decision. They contended that the Superintendent had offered an inappropriate placement for Monica and that St. Francis was the only appropriate educational opportunity.
 
 
 9
 The district court first considered the scope of review of a state administrative decision regarding placement of a child with special educational needs under 20 U.S.C. 1415(e)(2). Plaintiffs argued that the court should identify Monica's current exceptional educational needs, order a proper placement, and devise a suitable program to meet her current needs. The defendants took the position that the court's role was limited to determining the propriety of Superintendent Thompson's decision, and therefore that the court should either implement that decision or remand for a new placement determination. The district court noted that Congress had intended the courts to make independent program decisions based on a preponderance of the evidence,[2] and accordingly proceeded to consider Monica's present situation, 495 F.Supp. at 1260. To freeze the evidence at the time the original decision was made, the judge reasoned, would frustrate the court's ultimate responsibility to provide Monica with a "free appropriate public education." Id. at 1261.
 
 
 10
 In light of the current evidence, the district court found, contrary to the Superintendent's determination, that Monica did have an exceptional educational need in the area of emotional disturbance. The court noted, however, that the disagreement on that issue amounted to nothing more than a labeling problem and that the plaintiffs had not offered evidence to show that a diagnosis of emotional disturbance mandated any differences in programming. 495 F.Supp. at 1263.
 
 
 11
 In developing an appropriate placement for the then-coming school year, the district court considered the defendant's proposed individualized education program,[3] as well as the plaintiffs' evidence as to Monica's current needs and the plaintiffs' alternative recommended program. The court concluded that Monica should initially be placed in a public school classroom on a part-time basis.[4] To ease the transition from St. Francis, she would still attend the private school but gradually decrease her attendance there and move to full-time attendance in the public school. The court also ordered the school district to pay all costs associated with the transition.
 
 
 12
 The district judge then considered the nature of the relief authorized by section 615(e)(2), 20 U.S.C. § 1415(e)(2). He concluded that section 615(e)(2) was aimed only at establishing a private right of action for injunctive relief to ensure suitable programming for handicapped children and did not create a damage remedy. The district court noted the absence of any mention of damages in either the legislative history or the actual wording of the Act. 495 F.Supp. at 1269. The court found that the defendants had not done all that they could have for Monica but had not acted in bad faith. Id. Although finding the plaintiffs to be the prevailing parties, the district judge did not permit plaintiffs to recover attorney's fees because attorney's fees were not specifically authorized by the EAHCA. Id.II
 
 
 13
 Only the Fourth Circuit has faced the issue of whether a prevailing plaintiff can recover damages under section 615, 20 U.S.C. § 1415, and there the question arose in a fact situation somewhat different from ours. Stemple v. Board of Ed. of Prince George's Cty., 623 F.2d 893 (4th Cir. 1980), cert. denied, --- U.S. ----, 101 S.Ct. 1348, 67 L.Ed.2d 334 (1981). In Stemple, the handicapped child was enrolled in a public school program when the parents became dissatisfied and moved her to a private school. The child was subsequently re-enrolled in the public school, but the parents sought tuition reimbursement for the costs of sending their daughter to private school at the time that they did. The Fourth Circuit determined that section 615(e)(3), 20 U.S.C. § 1415(e)(3), was controlling on the issue of whether the parents could receive tuition reimbursements. Section 1415(e)(3) provides:
 
 
 14
 During the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement of such child, or, if applying for initial admission to a public school, shall, with the consent of the parents or guardians be placed in the public school program until all such proceedings have been completed.
 
 
 15
 20 U.S.C. § 1415(e)(3) (emphasis added).
 
 
 16
 That provision, the court concluded, created a duty on the part of a parent, who avails himself of the hearing and review provisions of section 615, to keep his child in the current placement, absent agreement otherwise. Conceding that the statutory duty might not be enforceable by the state, the court held that "it certainly negates any right on the part of parents, in violation of the duty and in the absence of agreement, to elect unilaterally to place their child in private school and recover the tuition costs thus incurred." Stemple, 623 F.2d at 897.[5]
 
 
 17
 The facts in our case differ from those in Stemple. Monica Anderson was attending private and public schools, each on a half-time basis, when the school authorities first assessed her special needs and decided on a placement. In our case, therefore, Monica's parents were complying at least in part with the dictates of section 615(e)(3) by keeping Monica at St. Francis which was her then-current half-time placement. As a result, section 615(e) (3), applied as the Fourth Circuit suggests, does not preclude reimbursement.[6] In fact, in any case in which a child is already receiving services that the school authorities subsequently determine they are not required to provide, reimbursement is not precluded by section 615(e)(3). Moreover, because we are certain that parents have the right to move their handicapped children to private schools, we view section 615(e)(3) as expressing a congressional preference rather than as creating a statutory duty. In short, we do not think that the issue of a damage remedy in our case can be resolved on the basis of section 615(e)(3), although we do find support in that provision for our conclusion that damages were not intended in most cases.
 
 
 18
 Our inquiry instead focuses on whether section 615(e)(2), authorizing aggrieved parents to bring a civil action and district courts to provide "such relief as the court determines is appropriate," 20 U.S.C. § 1415(e)(2), includes damages as "appropriate" relief. That question has never been decided by a federal court of appeals. For the reasons that follow, we conclude that damages, however limited, are not within the scope of relief authorized by section 615(e)(2), absent exceptional circumstances.
 
 
 19
 The availability of a damage remedy for incorrect placements under 20 U.S.C. § 1415(e)(2) is a matter of statutory interpretation. What must ultimately be determined is whether Congress intended to create the remedy asserted by the plaintiffs.[7] In making that determination, we must examine the statutory language, the legislative history, and the purposes Congress wished to achieve. In our view, section 615(e)(2) was intended in most cases to provide only injunctive relief as a final procedural safeguard that would ensure an appropriate educational program for a handicapped child.
 
 A.
 
 20
 Statutory interpretation begins with the language of the statute itself. Cannon v. University of Chicago, 441 U.S. 677, 689, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560 (1979). We must examine the meaning of the words and the context in which those words appear. District of Columbia v. Carter, 409 U.S. 418, 420, 93 S.Ct. 602, 604, 34 L.Ed.2d 613 (1973), citing Puerto Rico v. Shell Co. (P.R.), Ltd., 302 U.S. 253, 258, 58 S.Ct. 167, 169, 82 L.Ed. 235 (1937). Plaintiffs contend that the plain language of section 615(e)(2) entitles them to damages here because Congress gave aggrieved parties the right "to bring a civil action" and provided district courts with the power to "grant such relief as the court determines is appropriate."[8] Plaintiffs maintain that "appropriate" relief includes damages. Further, they assert that no evidence exists showing that Congress intended to limit the remedies traditionally available to a court. When Congress wishes to limit a court's power to injunctive relief, it is argued, it has done so explicitly.
 
 
 21
 We do not agree that "appropriate" relief necessarily includes a damage remedy as well as injunctive relief for every incorrect placement. Where courts have construed "appropriate" relief expansively, as the plaintiffs suggest we do here, they have not relied solely on the statutory language but have also considered the congressional intent. See, e. g., Simmons v. Avisco, 350 F.2d 1012, 1019 (4th Cir. 1965); Int'l Bro. of Boilermakers v. Brasewell, 388 F.2d 193, 199 (5th Cir.), cert. denied, 391 U.S. 935, 88 S.Ct. 1848, 20 L.Ed.2d 854 (1968); Int'l Bro. of Boilermakers v. Rafferty, 348 F.2d 307 (9th Cir. 1965). Moreover, those district courts which have considered the meaning of the term "appropriate" in the statute at hand have agreed that the language in section 615(e)(2) does not itself expressly authorize a damage remedy. Tatro v. Texas, 516 F.Supp. 968 (N.D.Tex.1981); Monahan v. Nebraska, 491 F.Supp. 1074, 1094 (D.Neb.1980), aff'd in part and rev'd in part, 645 F.2d 592 (8th Cir. 1981) (issue of whether damages generally available not reached); Miener v. Missouri, 498 F.Supp. 944 (E.D.Mo.1980); Loughran v. Flanders, 470 F.Supp. 110, 114 (D.Conn.1979); Boxall v. Sequoia U. Sch. Dist., 464 F.Supp. 1104, 1112 (N.D.Cal.1979).[9]
 
 
 22
 Viewing the language of section 615(e)(2) in the context of section 615 leads us to believe that Congress did not envision appropriate relief generally to include a damage remedy. Instead, section 615(e)(2) appears to be the last of many procedural safeguards in a section aimed at ensuring proper placements and programs for handicapped children. Section 615, itself entitled "Procedural Safeguards," requires state educational agencies "to establish and maintain procedures in accordance with (the requirements of this section) ... to assure that handicapped children and their parents ... are guaranteed procedural safeguards with respect to the provision of free appropriate education...." Required procedures include parental access to records, written notice concerning proposed changes or refusals to make changes, the opportunity to present complaints, and an impartial due process hearing by the state educational agency. If that hearing is conducted by a local or intermediate educational unit, an aggrieved party may appeal to the state educational agency for an impartial review and independent decision by the reviewing officer. The local and state hearings must allow for representation by counsel, presentation of evidence, confrontation, cross-examination and compulsory attendance of witnesses, a verbatim record, and written findings. 20 U.S.C. § 1415(b-d). For a party who is still aggrieved, the final procedural safeguard, an express right to bring an action in the district court and receive "appropriate" relief, is provided in section 615(e)(2). See n.8 supra. The plaintiffs themselves note that section 615(e)(2) "cap(s) the entire sequence of procedural safeguards." In our view, the context makes clear that "appropriate" relief was generally intended to be restricted to injunctive relief, the statutory language giving the district judge wide latitude to fashion an individualized educational program for the child.
 
 
 23
 Neither the statutory language nor the context in which it appears demonstrates a congressional intent to create any type of educational malpractice action. Congress instead has designed a detailed and multi-level procedure through which an aggrieved parent can ultimately seek an "appropriate" program decision from the district court.
 
 B.
 
 24
 The legislative history of the Act is silent on the question of whether a damage remedy was intended. In Loughran v. Flanders, 470 F.Supp. 110 (D.Conn.1979), the court commented on the Act and its predecessor,[10] noting: "The legislative histories of these Acts share a common trait; each is devoid of even the slightest suggestion that Congress intended for it to serve as a vehicle through which to initiate a private cause of action for damages." 470 F.Supp. at 114. The Senate Conference Report states simply that "any parent or guardian may present a complaint concerning any matter regarding the identification, evaluation, or educational placement of the child or the provision of a free appropriate public education to such child." S.Rep.No.94-455, 94th Cong., 1st Sess. 49, reprinted in (1975) U.S.Code Cong. & Ad.News 1480, 1502. Plaintiffs argue that reference to "any matter regarding ... a free appropriate public education" indicates an explicit congressional intent to provide damages. As we read the Conference Report, however, a parent can bring "any matter" concerning the educational situation of his child before the district court in order to obtain the appropriate educational placement. Also, the plaintiffs point out that the Conference Report states that courts can grant "all appropriate relief." The word "all," they argue, indicates that damages were intended. S.Rep.No.94-455, 94th Cong., 1st Sess. 50, reprinted in (1975) U.S.Code Cong. & Ad.News 1480, 1503. By using the phrase "all appropriate relief," we think that the conferees meant to emphasize that a district judge could adopt the program offered by the school district or the program advocated by the parents, or that he could take any other action and devise any program which in his view would ensure an appropriate individualized educational program. The Report makes no mention of damages, and there is no other evidence of any explicit intent to establish a damage remedy.
 
 
 25
 Nor do the concerns expressed by the Act's sponsors show an implicit intent to establish a damage remedy. In fact, our review of those concerns leads us to the opposite conclusion. See Woodwork Manufacturer's Assoc. v. NLRB, 386 U.S. 612, 640, 87 S.Ct. 1250, 1266, 18 L.Ed.2d 357 (1967) ("(I)t is the sponsors that we look to when the meaning of the statutory words is in doubt"); Federal Energy Admin. v. Algonquin SNG, Inc., 426 U.S. 548, 564, 96 S.Ct. 2295, 2304, 49 L.Ed.2d 49 (1975) ("(A) statement of one of the legislation's sponsors ... deserves to be accorded substantial weight in interpreting the statute.").
 
 
 26
 It is clear that the overriding congressional concern was meeting the needs of handicapped children. The elaborate system of procedural safeguards contained in section 615 was thought to be the best method of assuring appropriate program decisions. Due process hearings were required, said Senator Thomas Stafford, to assure that the rights of the children would be protected. 121 Cong.Rec. 37412 (1975). Senator Harrison Williams praised the section because it would "assure that the state and local agencies did not make inappropriate decisions regarding the identification, evaluation, and educational placement of handicapped children." 121 Cong.Rec. 37415 (1975). He noted that parents who disagreed with the state agency's decision could appeal to a state or federal district court to obtain appropriate relief and that the statute carefully provided for minimal disruption to the child during the decision-making process. See 20 U.S.C. § 615(e)(3). As the sponsors interpreted the bill, the rights of handicapped children would be protected by the combined effect of all the procedures contained in section 615, including 615(e)(2), because the result would ultimately be an appropriate educational program. There was no mention of compensatory relief.
 
 
 27
 The sponsors also expressly recognized the difficulty of diagnosing handicapped children. Congressman Albert Quie noted that "no one really knows what a learning disability is." 121 Cong.Rec. 25531 (1975). Congressman William Lehman pointed out that "little is known about the field," adding, "We are going to have to find what it is that is causing neurological impairment and learn the definition and the diagnosis of this dysfunction." 121 Cong.Rec. 25531 (1975). We think it would be incongruous for Congress to subject school systems to liability for damages each time a court disagreed with the school district's program while at the same time admitting the uncertainty of diagnosis in the field. The district judge correctly reflected the views of the sponsors when he noted that his function was not "one of allocating blame among the parties for their past inabilities to agree on an educational program for Monica...." 495 F.Supp. at 1264. In fact, we believe that it would sometimes be difficult to determine who is the prevailing party, as when the district court's plan contains elements of both parties' proposals or is wholly the product of neither.
 
 
 28
 Congress was also concerned about the lack of money available for education. Though aware of the tremendous need for programs for the handicapped, the sponsors were cognizant of budget constraints. Congressman John Brademas stated that despite state statutes and judicial opinions requiring a free education for the handicapped, the lack of state fiscal resources had made it impossible to implement the necessary programs. 121 Cong.Rec. 37025 (1975). Congressman Carl Perkins noted that educating handicapped children "created enormous financial burdens for already overburdened local and state educational resources." 121 Cong.Rec. 37025 (1975). Although the EAHCA was enacted to provide the necessary funding, we think it unlikely that it was generally intended to provide more than prospective relief.
 
 
 29
 Finally, Congress foresaw that services for all handicapped children could not be provided immediately. The sponsors noted that there were then almost four million handicapped children receiving inadequate services and that it would take time to rectify the situation. Priorities were established so that children with the most severe needs would benefit from the first federal funds. 121 Cong.Rec. 37417 (1975). An appropriations timetable was formulated with congressional funding increased over a six-year period to allow for budget constraints and orderly implementation of services. Id. Again, Congress thought in terms of curing the problem by providing eventual prospective relief. Because Congress expected that initially many handicapped children could not be helped, it is unlikely that damages would have been intended to ensue for that failure.
 
 
 30
 In short, Congress enacted the EAHCA in order to aid the states in educating their handicapped children by providing the necessary funds. The legislative history shows an emphasis on procedural safeguards to ensure appropriate placements, a recognition that diagnosis of special education problems was difficult and uncertain, an awareness of severe budgeting constraints, and an acknowledgment that it would take time for all handicapped children to be helped. In those circumstances, and without even a word of discussion about damages, we infer that that remedy was not generally intended.
 
 C.
 
 31
 In discerning the legislative intent, we also look at the "mischief to be corrected and the end to be attained." Warner v. Goltra, 293 U.S. 155, 158, 55 S.Ct. 46, 47, 79 L.Ed. 254 (1934). A damage remedy is not, in our view, generally consistent with the goals of this statute. When a school district makes a good faith effort to provide a child with an appropriate education, we do not believe that as a general rule it is good policy to require that a school district pay money damages if it later turns out that a different programming decision should have been made. Moreover, in as new and undeveloped a field as special education, there is a need for flexibility and experimentation in programming for handicapped children. We take judicial notice of the fact that at the present time, problems of classification and treatment abound. Disagreements will arise and errors will be made. In short, we perceive that educational programs for the handicapped will suffer if school officials, for fear of exposing themselves to monetary liability for incorrect placements, hesitate to implement innovative educational reforms. See Loughran v. Flanders, 470 F.Supp. 110 (D.Conn.1979). For this reason, implying a general damage remedy would hinder rather than help the very children for whose benefit the statute was enacted.[11]
 
 D.
 
 32
 Although we hold that the statute was not intended generally to provide a damage remedy for an incorrect placement decision, we can envision at least two exceptional circumstances in which a limited damage award might be appropriate. In those situations it is likely that Congress, though generally requiring that a child remain in his current placement, 20 U.S.C. § 615(e)(3), would have intended that parents take action to provide the necessary services for their children without awaiting the outcome of lengthy administrative and judicial proceedings. Parents should then be compensated for the costs of obtaining those services that the school district was required to provide.[12]
 
 
 33
 The first such circumstance was addressed in Tatro v. Texas, 516 F.Supp. 968 (N.D.Tex.1981). There a child's physical health would have been endangered had the parents not made alternative arrangements to those offered by the school system. Congress, which so explicitly expressed its concern for the needs and rights of handicapped children, could not have intended a child to remain in a placement in which there was a serious risk of injury to that child's physical health. In our view, when a court subsequently determines that the services in dispute were necessary to protect the physical health of the child and also were services that should have been provided by the school district, the district court has the statutory authority to recompense parents for the costs of those services the school district failed to provide.
 
 
 34
 A second exceptional circumstance would exist when the defendant has acted in bad faith by failing to comply with the procedural provisions of section 615 in an egregious fashion. Those procedural provisions were Congress's way of assuring appropriate programming for handicapped children. See supra at 1210-1212. In the event of disagreement, Congress intended that parents could present a meaningful challenge to the school district's program and receive fair and impartial hearings. In essence, parents were to rely on compliance with the statute through two levels of administrative hearings before they could seek judicial relief. Congress could not have intended, however, that parents would keep their child in an inappropriate situation in a case in which the school district was acting in bad faith. In those circumstances, most parents could and likely would arrange unilaterally for the appropriate services. Should the parents finally prevail in their judicial action, in those circumstances money damages for the cost of these services should be awarded.
 
 
 35
 Because we find that a damage remedy was not intended for an incorrect program decision absent exceptional circumstances, damages are not appropriate in this case.[13] The issue of danger to Monica's physical health was not raised. Moreover, the district court explicitly addressed whether the school district had acted in bad faith and concluded that it had not. We agree with that determination and therefore affirm the district court's decision denying damages.
 
 IV
 
 36
 Plaintiffs contend that their action is also cognizable under 42 U.S.C. § 1983 and thus that they are entitled to attorney's fees under 42 U.S.C. § 1988. They point to the Supreme Court's recent decision in Maine v. Thiboutot, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), which held that an action for benefits under the Social Security Act can be brought under section 1983 and that attorney's fees are recoverable under section 1988. Because we hold that plaintiffs' action is not cognizable under section 1983, attorney's fees are not available under section 1988.
 
 
 37
 In Tatro v. Texas, 516 F.Supp. 968 (N.D.Tex.1981), the court addressed this issue and determined that Thiboutot compelled the conclusion that a section 1983 action was possible so long as exhaustion under 20 U.S.C. § 1415 was a prerequisite. The Tatro court noted, however, that section 1983 served "no purpose other than that of a conduit for attorney's fees" and accordingly held that because "section 1983 has no greater role than the statute it purportedly enforces, its citation will not trigger the § 1988 attorney fee provisions." In contrast to the court in Tatro, we conclude that Thiboutot does not prohibit us from deciding that section 1983 is inapplicable.
 
 
 38
 In Thiboutot, the Court considered the Social Security Act, which is like the EAHCA in that it contains an elaborate internal remedial scheme but which differs from the EAHCA in that it fails to provide a private right of action. Section 1983, the Court held, provided a cause of action for plaintiffs who alleged that they were harmed by violations of the Social Security Act and were otherwise without a remedy. Plaintiffs in our case are not without a remedy under the EAHCA because section 615(e)(2) provides an express private right of action. Thus in our case the plaintiffs are not dependent on a section 1983 action for relief.
 
 
 39
 Moreover, the Supreme Court suggested recently in Pennhurst State Sch. & Hosp. v. Halderman, --- U.S. ----, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), that despite Thiboutot, section 1983 is not applicable in situations " 'where the governing statute provides an exclusive remedy for violations of the Act.' " Pennhurst, 101 S.Ct. at 1545, quoting Thiboutot, 448 U.S. at 22 n.11, 100 S.Ct. at 2513 (dissent). We conclude for the reasons that follow that the EAHCA provides an exclusive remedy.
 
 
 40
 The Supreme Court has considered several factors in deciding whether a statutory remedy was intended to be exclusive. In Brown v. GSA, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976), the Court examined the legislative history of section 717 of Title VII together with the "balance, completeness and structural integrity" of that Title,[14] and concluded that Congress had intended to create an "exclusive, preemptive administrative and judicial scheme...." Brown, 425 U.S. at 829, 96 S.Ct. at 1966. Unlike the Social Security Act at issue in Thiboutot, but like the EAHCA, section 717 itself provided an aggrieved party with an express right of action.
 
 
 41
 In Brown, the issue was not whether the section 717 claim was cognizable under 1983, but whether other substantive statutes provided relief for violations of the same rights that were remedied in section 717. The Court noted that the legislative history of section 717 revealed a congressional concern for "the apparent inability of federal employees to engage the judicial machinery in cases of alleged employment discrimination." Brown, 425 at 827, 96 S.Ct. at 1965. Congress believed that section 717 would protect the rights of federal employees for the first time. Moreover, a holding that section 717 rights were also remedied in other statutes, the Court stated, would have thwarted the carefully-designed administrative prerequisites of section 717.[15] Because the right was thought by Congress to be newly-created and because section 717 established its own administrative and judicial enforcement system, section 717 was held to be an exclusive judicial remedy.
 
 
 42
 Recently, the Supreme Court, facing a situation similar to ours in Great American Fed. S. & L. Ass'n v. Novotny, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979), held "for the same basic reasons that underlay the Court's decision in Brown v. GSA," that 42 U.S.C. § 1985(c) could not be invoked to redress violations of Title VII. Novotny, 442 U.S. at 378, 99 S.Ct. at 2352. Like section 1983, section 1985(c) created no new substantive rights and the "only question (was) whether the rights created by Title VII (could) be asserted within the remedial framework of § 1985(c)." Novotny, 442 U.S. at 377, 99 S.Ct. at 2351 (emphasis in original). First the Court noted that Title VII provided a "detailed administrative and judicial process designed to provide an opportunity for nonjudicial ... resolution of claims." Novotny, 442 U.S. at 372-73, 99 S.Ct. at 2349-50. As part of its comprehensive plan, Congress had prescribed certain time limits and specified a limited form of relief. Those provisions could be avoided, the Court stated, if a violation of Title VII could be asserted through section 1985.[16] Moreover, the Novotny Court distinguished its Title VII case from cases relating "the substantive provisions of last century's Civil Rights Act to contemporary legislation conferring similar substantive rights." Novotny, 442 U.S. at 377, 99 S.Ct. at 2351. In the latter cases, the Court had held that nineteenth century substantive rights were not withdrawn by the subsequent passage of modern statutes protecting the same rights. In Novotny, the Court emphasized, the situation was different because the right claimed did not even arguably exist before the passage of Title VII in 1964.
 
 
 43
 The EAHCA, like the statutes at issue in Brown and Novotny, contains an elaborate administrative and judicial enforcement system. See supra at 1210-1212. Moreover, Congress when enacting the EAHCA also believed that the rights it was creating had heretofore been inadequately protected under federal law. ("Too long have the needs of these handicapped children been neglected.... The (EAHCA) promises handicapped children the educational opportunity that has long been considered the right of every other American child." (Remarks of Sen. Randolph, 121 Cong.Rec. 37410 (1975)); "The goal of this legislation is to raise the quality of education for millions of handicapped children to a new standard of excellence and equal opportunity never before envisioned." (Remarks of Sen. Taft, 121 Cong.Rec. 37412 (1975)); "(H)andicapped children no longer will be left out" (Remarks of Sen. Williams, 121 Cong.Rec. 27413 (1975)).[17]
 
 
 44
 The most compelling reason, however, for our conclusion that section 615(e)(2) is an exclusive remedy is that the relief it provides is inconsistent with section 1983 relief. Because we hold that the EAHCA does not contain a traditional damage remedy, section 615 cannot be given "unimpaired effectiveness" if a section 1983 action is available for EAHCA violations. Novotny, 442 U.S. at 378, 99 S.Ct. 2352.[18] In Adickes v. Kress & Co., 398 U.S. 144, 150-151 n.5, 90 S.Ct. 1598, 1604-05, 26 L.Ed.2d 142 (1970), the Supreme Court discussed whether a section 1983 cause of action was possible in a case in which the governing statute did not provide damages. There the plaintiffs had asserted that a violation of the Public Accommodations Act could serve as a basis for recovery under section 1983. The Court concluded that it was "very doubtful" that a section 1983 action could be brought because the remedy provided by the Public Accommodations Act did not provide for damages and thus was intended to be the "exclusive means of enforcing the (Public Accommodations Act) rights." 398 U.S. at 150-151, 90 S.Ct. at 1604-05.[19] In the case before us, we have determined that section 615(e)(2) precludes damages absent exceptional circumstances. Because 42 U.S.C. § 1983 is not similarly limited in the scope of the relief it provides, the remedies in the two statutes are inconsistent.
 
 
 45
 In sum, the availability of a private right of action under the EAHCA, the detailed statutory administrative and judicial scheme, the fact that Congress intended the EAHCA to create new rights, and the absence of a traditional damage remedy, together compel our conclusion that the judicial remedy provided in the EAHCA was intended to be exclusive. The EAHCA does not itself provide for attorney's fees and plaintiffs cannot rely on section 1983 as a conduit to attorney's fees under section 1988.[20]
 
 
 46
 AFFIRMED.
 
 
 
 *
 The Honorable Daniel H. Thomas, United States Senior District Judge for the District of Alabama, is sitting by designation
 
 
 [1]
 20 U.S.C. § 1414(d) states that whenever a local agency is unable or unwilling to provide an appropriate education, the funds which would ordinarily have been used by the local educational agency may be used to "provide such education and services in such manner, and at such locations ... as it considers appropriate." Hence, a child can receive a "free appropriate public education" at a private school
 
 
 [2]
 S.Rep.No.94-455, 94th Cong., 1st Sess. 50, reprinted in U.S.Code Cong. & Ad.News 1480, at 1503 (1975)
 
 
 [3]
 20 U.S.C. § 1401(19)
 
 
 [4]
 At the time of the district court decision the parties agreed that Monica could no longer attend St. Francis full time because she was too old
 
 
 [5]
 Moreover, the court stated, it was of no moment whether proceedings under section 615 are initiated before or after the duty to preserve the status quo is breached: "The duty ... arises as soon as school authorities make a decision as to identification, evaluation and placement of a handicapped child and continues until a decision not to contest it is reached, or, if a contest ensues, until that contest is finally determined." Stemple, 623 F.2d at 898. In Stemple, the child had been moved from public to private school after the school made its decision as to her placement
 
 
 [6]
 In addition to tuition reimbursement, plaintiffs in our case also seek the costs of their administrative appeals as damages
 
 
 [7]
 A Cort v. Ash analysis is not appropriate because the issue is not whether there is an implied private right of action. Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). Here Congress has expressly created a cause of action and empowered the district court to grant "such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). The question is whether damages are "appropriate" relief
 
 
 [8]
 Section 615(e)(2) of the Education of the Handicapped Act provides:
 Any party aggrieved by the findings and decision made (by the state educational agency), shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy. In any action brought under this paragraph the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.
 
 
 [9]
 The courts are not in agreement, however, on whether damages are nonetheless recoverable under the EAHCA
 
 
 [10]
 Public Law 93-380, an Act known as the "Education of the Handicapped Amendment for 1974."
 
 
 [11]
 Plaintiffs contend that a damage remedy is necessary to enforce these due process provisions. The EAHCA, however, already has a built-in mechanism for enforcement. Compliance with the statutory provisions is a prerequisite to the receipt of federal funds. See 20 U.S.C. § 1412
 
 
 [12]
 Parents' costs of obtaining services that the school district was required to provide are the only appropriate money damages in these exceptional circumstances. In no event can we imagine that tort liability damages were intended
 
 
 [13]
 Had we concluded that damages might be appropriate in this case, we would have remanded to the district court for a determination that the defendants had in fact violated the EAHCA. The district court never made that explicit finding, although he noted that the school district had not done all that it could have "to meet its obligations under state and federal law." 495 F.Supp. at 1269
 The plaintiffs, arguing that the defendants had violated the EAHCA, submitted pursuant to Circuit Rule 11 an opinion letter from the United States Department of Education which they contend supports their argument that individualized educational programs were required as of October 1, 1977. The defendants moved to strike that submission on the basis that it did not qualify under our Circuit Rule. The plaintiffs filed an objection to the motion to strike.
 It is true that the district judge concluded that the Department of Health, Education and Welfare had extended to July 1, 1980 the date by which local educational agencies in Wisconsin were to comply with the individualized educational program requirements of the EAHCA. He went on to state, however:
 Since the Court does not view its function in this case as one of allocating blame among the parties for their past inabilities to agree on an education program for Monica, the present significance of West Allis' past omission to write short term instructional objectives and evaluation criteria for Monica lies only in its effect on West Allis' ability to comply now with the federal requirement that an IEP for Monica be in effect prior to the commencement of the 1980-1981 school year.
 
 
 [495]
 F.Supp. at 1264
 The issue before us is whether a damage award is appropriate for violations of the EAHCA. Because we agree with the district court that damages are not recoverable here, we do not find it necessary to reach the issue about which the parties disagree.
 
 
 [14]
 Section 717 of Title VII provides a remedy for employment discrimination claims of federal employees
 
 
 [15]
 The Court stated that "(i)n a variety of contexts, (it) has held that a precisely drawn, detailed statute pre-empts more general remedies." Brown, 425 U.S. at 834, 96 S.Ct. at 1968
 
 
 [16]
 In Tatro, 516 F.Supp. 968 (N.D.Tex.1981), the court noted that a similar thwarting of congressional intent could be avoided in a section 1983 action by requiring that the governing statute's administrative remedies be exhausted. The issue of exhaustion was not addressed in Novotny. We conclude that Congress intended the remedy provided by the EAHCA to be exclusive and that the supplementary relief afforded by section 1983 would thwart that intention even if exhaustion is required. See infra at 1215-1217
 
 
 [17]
 In Brown v. GSA, the Court noted that "the relevant inquiry is not whether Congress correctly perceived the then state of the law, but rather what its perception of the state of the law was." 425 U.S. at 828, 96 S.Ct. at 1966 (footnote omitted)
 
 
 [18]
 See n.16, supra
 
 
 [19]
 The Court went on to note that there could be recovery under 1983 for conduct that violated the Fourteenth Amendment, even though the same conduct might also violate the Public Accommodations Act. That issue is not before us here. Although the plaintiffs argue in one sentence of their brief that the EAHCA rights are of "constitutional dimension," no constitutional violation was alleged in the complaint and that issue was neither briefed nor discussed at oral argument
 
 
 [20]
 In the final paragraph of their brief, the plaintiffs assert that they have stated a cause of action under the Rehabilitation Act, 29 U.S.C. § 794, because they contend that the standards for compliance with the Rehabilitation Act are "virtually identical" to those of the EAHCA. The Rehabilitation Act provides for attorney's fees. 29 U.S.C. § 794a. A violation of 29 U.S.C. § 794 was not alleged in the complaint or raised in the district court. Accordingly, we decline to address it here