**LAMONT X, a minor ward of the State of Ohio, Albert W. Garbett, guardian and next friend, Dayle Deardurff, guardian ad litem, Pro-Kids and Del Y, a minor ward of the State of Ohio, Jeffrey Wycoff, guardian and next friend, Vinton County Childrens Services on behalf of themselves and all others similarly situated, Plaintiffs,**

**v.**

**Robert QUISENBERRY, Superintendent Hamilton Public Schools, Robert Kinch, President, Hamilton Board of Education, Hamilton Board of Education, Defendants.**

**Civ. A. No. C–1–84–1417.**

United States District Court,
S.D. Ohio, W.D.

Oct. 26, 1984.

810

Michael J. Mooney, Cincinnati, Ohio, for plaintiffs.

Jack C. McGowan, Thomas Baden, Hamilton, Ohio, for defendants.

## MEMORANDUM AND ORDER

DAVID S. PORTER, Senior District Judge:

### I. *Facts*

This case arises under the Education for All Handicapped Children Act (EAHCA), 20 U.S.C. § 1401 *et seq.* Now before the Court is plaintiffs' motion for a preliminary injunction, pursuant to 20 U.S.C. § 1415(e)(3), prohibiting the defendants, the Hamilton, Ohio Board of Education and its administrators, from preventing plaintiffs Lamont and Del from returning to the classroom pending the outcome of certain statutory proceedings.

Del and Lamont are Severely Behaviorally Handicapped ("S.B.H.") children who live at The Children's Home of Butler County. There is no dispute that plaintiffs are both "handicapped children" within the broad language of 20 U.S.C. § 1401(1), which defines the term as including

> mentally retarded, hard of hearing, deaf, speech impaired, visually handicapped, *seriously emotionally disturbed*, orthopedically impaired, or other health impaired children, or children with specific learning disabilities....

(Emphasis supplied.) Defendant Board of Education is a "local educational agency" as defined in 20 U.S.C. § 1401(8), and as such is bound, by virtue of accepting federal funds for educating handicapped children, to have "a goal of providing full educational opportunities to all handicapped children[.]" 20 U.S.C. § 1414(a)(1)(C)(i).

The record reflects that The Children's Home is an exemplary facility in many regards, and has enjoyed success where, our own experience reflects, many similar facilities have been forced to close their doors. This success undoubtedly explains why the minor plaintiffs were sent there. Del, who is now 15 years old, was a resident at a psychiatric hospital for approximately eighteen months prior to his arrival at the Children's Home, his mother having given up custody of him as a result of his destructive tendencies and uncontrolled outbursts—behavior which plaintiffs' expert witness called "the name of the game" as regards S.B.H. children.

Lamont's story is no happier. Now 12 years old, Lamont's history prior to enrollment at The Children's Home included his mother's giving up custody at an early age, a history of abuse by his natural mother, and limited contacts with a grandmother. Lamont came to The Children's Home from an orphanage, behavioral problems having led to the transfer when he was nine. His behavior problems include "aggressive outbursts, behavior control problems, destructiveness toward property and physical abuse of others ... and a tendency to be easily stimulated." Joint Exhibit 2 at 1.

Prior to the 1984–85 school year, Del and Lamont were placed in an S.B.H. classroom which, although provided by defendant Board, was located on the grounds of The Children's Home. Perhaps because defendants concluded that conducting the S.B.H. class at the Home prevented them from exercising sufficient control over the classroom, the decision was made to move the S.B.H. program to a regular school building for the 1984–85 school year.

The record reflects that on several occasions throughout the 1983–84 school year, each minor plaintiff was involved in several episodes of disruptive or violent behavior. The record does not reflect how those incidents were handled. We find, however, that upon commencement of the 1984–85 term, defendants determined it appropriate to change their approach to the discipline of unruly or violent S.B.H. children.

On August 28, 1984, the first day of the school year,

> Del was playing a game with other students and suddenly became angry. He hit another student, kicked him, ripped his collar off his shirt, and then threw books and a ruler around the classroom. At that time he was removed from the class because it was feared that he might cause harm to himself or others.

Defendant's Exhibit A, Affidavit of Betty Senior, at ¶ 5.J.

> Two days later, on August 30, 1984, Lamont X would not follow [his teacher's] directions, and became angry, thereafter telling affiant 'I'm going to kick your ass[.'] He also stated at that time to affiant, 'If you come near Stuhlmueller (his residential cottage) you will never come out[.'] On that occasion, Lamont X picked up a plastic baseball bat and began striking objects in the classroom. He destroyed furniture, threw objects around the room, and generally destroyed the classroom. He thereafter stole property out of the cupboard in the classroom. The police were called and he was removed from the classroom at that time because it was felt that his behavior endangered other students, and the teacher.

Defendant's Exhibit B, Affidavit of Nancy Vincent, at ¶ 4.F.

As a result of these incidents, Del was removed from the classroom until January, 1985, and Lamont was removed until May, 1985. Defendants are presently attempting to provide each child with one hour of instruction, by tutors who go to The Children's Home, each day.[1] Each child was

---

1. Defendants assert that they are prepared to provide as much home instruction as Del and Lamont can absorb. Mrs. Senior testified that while competent tutors had been retained for both children, it was quite difficult even to gain their attendance at the home tutoring sessions; indeed, the first eight attempts to tutor Del were fruitless because of his decreased attention span and unwillingness to show up at the sessions. While we fully credit defendant's willingness to provide as much home instruction as appears fruitful under the circumstances, we are unpre-

prosecuted for the August episodes, and each was adjudged delinquent under Ohio law.[2]

## II.

The legal issues raised in the motion for preliminary injunction and associated papers are twofold. First, was the August, 1983 modification of plaintiffs' individualized education programs ("IEPs") a "change in placement" as that term is used in 20 U.S.C. § 1415(e)(3)? Second, if a change in placement occurred, were defendants justified in removing plaintiffs from the classroom for reasons of public—or plaintiffs' own—safety?

### A. *Change in Placement*

One of the most important features of the EAHCA is that Congress included § 1415, which delineates comprehensive procedural safeguards for those children and parents or guardians who perceive their rights under the Act as having been abridged. The Supreme Court has opined that "the importance Congress attached to these procedural safeguards cannot be gainsaid." *Board of Education of the Hendrick Hudson Central School District, Westchester County v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 3050, 73 L.Ed.2d 690 (1982). The statute provides, as relevant here, for notice to parents or guardians whenever the local agency proposes to change a child's educational placement; a hearing regarding the appropriateness of such a change in front of an impartial hearing officer, which hearing includes a panoply of procedural and substantive rights enumerated in § 1415(d); a right of

appeal to the relevant State educational agency under § 1415(e)(2); and, of immediate importance, this provision:

> During the pendency of any proceedings conducted pursuant to [§ 1415], unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement of such child. . . .

20 U.S.C. § 1415(e)(3).

■ Thus, where, as here, the local educational agency has determined that a child shall be removed from the classroom, the determination of whether a change in placement has occurred is critical to evaluation of the propriety of the school's actions.

■ We are not without considerable guidance from other courts in resolving this question. It is clear, for example, that expulsion for disciplinary reasons is a change in placement. *Kaelin v. Grubbs*, 682 F.2d 595, 599–602 (6th Cir.1982); *Doe v. Koger*, 480 F.Supp. 225, 228–79 (N.D.Ind. 1979). At the same time, however,

> defining a change in placement to include any alterations in a program 'would virtually cripple the Board's ability to implement even minor discretionary changes within the educational programs provided for its students" and would also inhibit the Board from introducing new activities or programs.

*Tilton v. Jefferson County Board of Education*, 705 F.2d 800, 804 (6th Cir.1983), *quoting Concerned Parents & Citizens for the Continuing Education at Malcolm X. (PS 79) v. New York City Board of Education*, 629 F.2d 751, 755 (2d Cir.

pared to accept the proposition that plaintiffs can be expected to perform in such a manner as to warrant increased efforts on the part of the tutors given the difficulties attendant to home study. As one court has put it, "reduc[tion] to some type of homebound tutoring . . . can only serve to hinder plaintiff's social development and to perpetuate the vicious cycle in which she is caught." *Stuart v. Nappi*, 443 F.Supp. 1235, 1240 (D.Conn.1978).

**2.** Upon the present state of the record in this case, we cannot help but be troubled by the decision to prosecute the minor plaintiffs for

the August disturbances, particularly when prosecution was combined with removal from the classroom for several months. Plaintiffs' handicap by definition includes a likelihood for behavioral disturbances, and the fact that defendants chose criminal prosecution as an appropriate response to such behavior leads us to question whether the school may have simply decided that it was time to take harsh action in such instances as a policy matter, a result which we do not perceive as wholly in keeping with the spirit and purpose of the EAHCA.

1980), *cert. denied,* 449 U.S. 1078, 101 S.Ct. 858, 66 L.Ed.2d 801 (1981). We note that the *Tilton* panel sought to define a change in placement as occurring when a modified educational program is "not comparable" to the plan set forth in the original IEP. 705 F.2d at 804.

There is, then, a natural tension between the mandate that an educational agency not unduly modify a child's educational placement without either obtaining the responsible adult's consent or following the due process provisions of § 1415, and the common-sense principle that educators must be given sufficient latitude in determining how to educate a given child or group of children so as not to thwart their creativity or, as in *Tilton* and *Malcolm X,* run afoul of legitimate budgetary concerns.

■ We think, however, that by any measure, taking a child from the classroom and instead providing home-based tutoring constitutes a change in placement. Were the plain meaning of the words not enough for that conclusion, we note that 34 C.F.R. § 300.551 defines "alternative *placements*" to include, among others, "instruction in regular classes, *special classes,* special schools, *home instruction,* and instruction in hospitals and institutions" (emphasis supplied); *see also Malcolm X.,* 629 F.2d at 754 (change in placement includes "decisions to transfer a child from one type of program [as defined in 34 C.F.R. § 300.-551(b)(1) ] to another.")

■ Thus, we need not find that defendants expelled plaintiffs from school, as was the case in *Kaelin,* 682 F.2d 595, to conclude that a change in placement occurred. Because we think it clear that the substantial programmatic modification which occurred here fits within any definition of placement change we have discovered, we find that a change in placement did in fact occur within the meaning of the statute and regulations.[3]

■ Defendant argues that even though a change in placement has occurred, § 1415(e)(3) does not impose a duty to maintain the child in the existing placement, but rather evidences a "congressional preference" for that course. In support of that proposition, plaintiffs cite *Anderson v. Thompson,* 658 F.2d 1205, 1209 (7th Cir.1981). *Anderson,* however, merely held that where school officials have acted in bad faith or where the present placement presents "a serious risk of injury to that child's physical health," the child's *parents* may unilaterally change the child's placement without committing a violation of the statute. Similarly, in *Doe v. Brookline School Committee,* 722 F.2d 910, 916–18 (1st Cir.1983), the court held that

because Congress has expressed a strong preference for the preservation of the status quo through its enactment of [§ 1415](e)(3) ... the motion for preliminary injunction should be made by the party wishing to depart from the status quo, here the school committee.

*Id.* at 917. *Brookline,* however, like *Anderson,* is a case where the child's parents sought to withdraw him from public school and enroll him in a private institution without following the administrative review procedures set forth in § 1415. *Accord, Stacey G. v. Pasadena Independent School District,* 695 F.2d 949, 953–54 (5th Cir.1983); *Ruth Anne M. v. Alvin Independent School District,* 532 F.Supp. 460, 465 (S.D.Texas 1982); *Foster v. District of Columbia Board of Education,* 523

---

**3.** To the extent that the decision as to whether a change in placement occurred is a factual one, we give substantial weight to the testimony of plaintiffs' expert witness, Dr. Joseph Cresci. Dr. Cresci, who served as the Cincinnati School Board's consultant for S.B.H. matters for ten years, testified as follows:

Q. Do you consider home instruction to be equivalent to the classroom experience that these kids were having prior to being put on home instruction?

A. Absolutely not.

Q. And what's the difference?

A. Well, the whole idea of the S.B.H. classroom and having a teacher and hopefully an aide is to develop a relationship with the student and that the whole point of the residential treatment, as well as S.B.H. classroom, is to provide for the child a corrective emotional experience with the [adults concerned]. And I don't think that one hour a day provides that kind of experience.

F.Supp. 1142, 1145 (D.D.C.1981). We have no quarrel with the proposition that a parent who believes that his child is receiving inappropriate service from a local educational agency may take unilateral action to change the child's placement prior to the outcome of the administrative processes.[4] This does not, however, mean that the local educational agency has the same right; we think that different policy considerations come into play, and that the proper interpretation of (e)(3) as it pertains to the actions of local educational agencies is that in such situations, the provision operates much like a rebuttable presumption that maintaining the original placement is required. This approach both acknowledges the strong wording of the statute—"the child *shall* remain" (emphasis supplied)— while preserving to courts enforcing the EAHCA their "traditional powers of equity" in fashioning appropriate remedies for apparent violations. *See Doe v. Brookline*, 722 F.2d at 917; *Stacey G.*, 695 F.2d at 955.

■ We therefore conclude that plaintiffs, by demonstrating that they have been subjected to a change in placement which was not approved by their guardians and has not yet been vindicated by administrative mechanisms, have established that they are entitled to injunctive relief. They have also demonstrated that they are entitled to return to the classroom pursuant to 20 U.S.C. § 1415(e)(3), absent equitable factors sufficient to defeat that entitlement.

### III.

We therefore turn our attention to defendants' assertion that the nature of the disciplinary infractions committed by Del and Lamont are so severe as to, in effect, constitute an equitable defense to the issuance of an injunction mandating their return to the classroom. These contentions are not without merit, and so we examine them below.

To recap, both children were involved in violent outbursts during the first week of school. While we give limited credence to the adjudications of delinquency herein as indicia of the severity of the outbursts, we nonetheless credit the affidavits and testimony of school officials to the effect that the incidents were sufficient to evidence a strong possibility that the involved adults, other students, or plaintiffs themselves could be injured in subsequent outbursts by the plaintiffs in the event they return to class.

In this regard, defendants call attention to the regulations implementing § (e)(3). In keeping with the statute, 34 C.F.R. § 300.513 provides that

> [d]uring the pendency of any administrative or judicial proceeding regarding a complaint, unless the public agency and the parents of the child agree otherwise, the child involved in the complaint must remain in his or her present educational placement.

The Comment to that regulation, however, reads as follows:

> Section 300.513 does not permit a child's placement to be chaged [sic: changed] during a complaint proceeding, unless the parents and agency agree otherwise. While the placement may not be changed, this does not preclude the agency from using its normal procedures for dealing with children who are endangering themselves or others.

---

**4.** It is significant, we think, that under *Anderson* and its progeny, while parents are not under a statutory duty to leave their handicapped child in a placement they find unsatisfactory pending the outcome of several tiers of administrative and judicial proceedings, parents who act unilaterally run the risk of being unable to obtain reimbursement for tuition expenditures except in instances where the educational agency's decision to disagree with the parent's wishes occurred in bad faith or where the child's physical health was endangered. *See Anderson*, 658 F.2d at 1213–14. The likelihood that expenses incurred as a result of unilateral action will not be reimbursed acts as a significant deterrent to such decisions on the part of parents. Unless § (e)(3) is viewed as placing a duty upon the educational agency not to take unilateral action, however, no similar disincentive exists to discourage such events. We therefore think that the *Anderson* rationale is best confined to the situation in that case.

Defendants understandably assert that this language permits them to act as they have done in this instance. While this assertion is not insubstantial, we find problems with it. First, both sentences of the comment state that the placement may not be changed. Because we have concluded that in fact a change of placement occurred, we think that to find that the comment in effect authorizes changes of placement for children who are intermittently violent would be to do an injustice to the comment, as well as to the regulation and to § (e)(3) itself.

■ Equally to the point, defendants do not assert that prolonged home study reflects their "normal procedures" for dealing with such problems. Mrs. Senior testified that the school's normal disciplinary procedures include suspensions for up to ten school days or expulsion. We are thus constrained to conclude, in the absence of evidence to the contrary, that the program developed for plaintiffs is not a "normal procedure" utilized by defendants in handling such problems.

In *S–1 v. Turlington*, 635 F.2d 342, 348 (5th Cir.1981), the court specifically concluded that "expulsion is still a proper disciplinary tool under the EHA ... when proper procedures are utilized and under proper circumstances. We cannot, however, authorize the complete cessation of educational services during an expulsion period." Be that as it may, however,

> "unlike any other disruptive child, before a disruptive handicapped child can be expelled, it must be determined whether the handicap is the cause of the child's propensity to disrupt. This issue must be determined through the change of placement procedures required by the handicapped act."

*Id.*, quoting *Doe v. Koger*, 480 F.Supp. 225, 229 (N.D.Ind.1979).

Similarly, in *Stuart v. Nappi*, 443 F.Supp. at 1241–42, the court considered the effect of the comment to § 300.513, as well as a preliminary "comment-to-the-comment" (now apparently deleted) which provided in part that

> [c]ommenters suggested a provision be added to allow change of placement for health or safety reasons. One Commenter requested that the regulations indicate that suspension not be considered a change in placement.

*Stuart*, 443 F.Supp. at 1242, *quoting* 42 Fed.Reg. 42,473, 42,512 (1977). We can do no better than Judge Daly's conclusion that the

> somewhat cryptic statement [embodied in the comment] suggests that subsection 1415(e)(3) prohibits disciplinary measures which have the effect of changing a child's placement, while permitting the type of procedures necessary for dealing with a student who appears to be dangerous.... [S]chools are permitted to use their regular procedures for dealing with emergencies.

*Stuart*, 443 F.Supp. at 1242 (footnote omitted).

■ In short, defendants, when faced with what was arguably an "emergency" situation, did not respond by means of their "normal procedures" for handling such situations. Given the fact that the response was, instead of a one- or two-week suspension, a relatively long-term change in placement, neither can we conclude that a sufficient "emergency" persists to justify continued exclusion of plaintiffs under the present arrangement.

■ We therefore conclude that defendants have not demonstrated that long-term exclusion of plaintiffs from the classroom was justified under § 300.513 or the comment thereto. While we in no way suggest that removal from the classroom was inappropriate at the time of the incidents, we cannot conclude that continued exclusion—or indeed, exclusion for a period longer than that contemplated by the school's normal disciplinary suspension procedures—is appropriate.

## IV.

We now turn to the question of whether a preliminary injunction should issue. The standard which we apply is that set forth in

*Mason County Medical Association v. Knebel,* 563 F.2d 256, 261 (6th Cir.1977), directing application of the following factors:

1. Whether the plaintiffs have shown a strong or substantial likelihood or probability of success on ther merits;
2. Whether the plaintiffs have shown irreparable injury;
3. Whether the issuance of a preliminary injunction would cause substantial harm to others;
4. Whether the public interest would be served by issuing a preliminary injunction.

Defendant argues that plaintiffs have not shown a substantial likelihood that they will suffer irreparable injury. They assert that

> Plaintiffs are presently receiving individualized tutoring for as long as they are able to stay on task. Furthermore, the defendants are willing to increase the tutorial time as the plaintiffs improve in their ability to improve their attention span. Moreover, the educational process is taking place in the very same environment (with the exception of additional students in the class room) as they experienced during the previous school year. Dr. Cresci [plaintiff's expert witness] testified that events can occur in a class room where other students are present that would precipitate a violent outburst, and the teacher may not even be aware of what the precipitating event was. Certainly, the reduction of the teacher to student ratio to one-on-one lessens the likelihood of such behavior reoccurring which therefore improves the changes of a meaningful, educational environment.

Doc. 6 at 4.

Defendants' argument on this point is not unpersuasive; however, after long consideration, we think it breaks down upon close scrutiny. Much of our concern is captured by the comment of the court in *Stuart v. Nappi,* 443 F.Supp. at 1240, in evaluating whether the plaintiff there showed possible irreparable injury:

Of particular concern to the Court is the possibility that ... plaintiff's education will be reduced to some type of homebound tutoring. Such a result can only serve to hinder plaintiff's social development and to perpetuate the vicious cycle in which she is caught. *See Hairston v. Drosick,* 423 F.Supp. 180, 183 (S.D.W.Va. 1976) (holding that it is 'imperative that every child receive an education with his or her peers insofar as it is at all possible'). The Court is persuaded that plaintiff's expulsion would have been accompanied by a very real possibility of irreparable injury.

In other words, we do not doubt that isolation of plaintiffs for one-on-one tutoring will substantially reduce the possibility that further outbursts will occur in the context of the tutorials. However, we think it clear that the benefits children with severe emotional handicaps receive from special educational placements far exceed the ability to "stay on task;" the prospects for emotional and social development are surely reduced as well.

The fact that plaintiffs' tutorials may be taking place in the same room in which the S.B.H. classes were held last year, even if true, is largely irrelevant as a factor militating against a determination that plaintiffs are likely to suffer irreparable harm from removal from class for the durations memorialized in the August IEPs.

We also agree with the court in *Cox v. Brown,* 498 F.Supp. 823, 829 (D.D.C.1980) (footnote omitted) that

> absent injunctive relief, [plaintiffs] will suffer the irreparable harm of lacking each day of their young lives an appropriate education, one that is sensitive to their particular disabilities, commensurate to their levels of understanding, and fulfilling of their immediate needs. This most important requirement for injunctive relief has been satisfied.

We therefore find, as a matter of fact, that plaintiffs are likely to suffer irreparable harm unless defendants are enjoined to modify their present delivery of educational services to them. We acknowl-

edge the possibility that plaintiffs may be receiving more psychological or non-school-related educational services by virtue of their residence at The Children's Home than would be the case were they living in a noninstitutional environment; however, the obligation to educate is not the Home's, but defendants'. Moreover, the record as it stands does not support the proposition that the Home is equipped to deliver services similar to those available from specially-trained educators.[5] We therefore conclude that the Home is, at present, better-equipped to serve as surrogate parents than surrogate educators.

■ Defendants also assert that plaintiffs are unlikely to succeed on the merits of this case. We are, quite frankly, not sure what the "merits" will be; however, review of the complaint suggests that plaintiffs intend to seek permanent injunctive relief on a class-wide basis, attorney's fees, and costs. As to the latter aspects of plaintiffs' prayer, the availability of such relief is a matter beyond the scope of the present inquiry. However, because we find today that the defendants have violated the procedural terms of the EAHCA, we need go no further in determining that they have demonstrated a likelihood of success on the merits.

■ The third factor is the most difficult on the facts of this case. As defendants note, "[t]he state of the record is such that there can be no misconception that plaintiffs are certainly capable of inflicting severe harm upon person and property." Doc. 6 at 5. That fact does not demonstrate that issuance of an injunction "would cause substantial harm to others;" however, we are acutely aware that placing plaintiffs back in the classroom is necessarily accompanied by a possibility that their handicap will again manifest itself in violent outbursts. In fact, there is little reason to suppose that it will not. In one sense, the risk of such outbursts is the risk of assuming responsibility, as have defendants, for educating severely behaviorally handicapped children.[6] However, any injunction issued herein will incorporate features which we hope will reduce the prospects for such activity; we also note that under no circumstances will any injunctive relief herein purport to override the defendants' ability to use their normal disciplinary procedures in the event of further difficulty with plaintiffs.[7]

(Tr. 1 at 18–19).

5. Plaintiffs' counsel stated that
the head of Children's Home is a Ph.D. His Ph.D. is in psychology. They have—he happens to be married to a Ph.D. psychologist who is also on the staff at Children's Home. Below them there are several social workers who have bachelor's degrees in social work. Below them are house counselors who have direct responsibility for the children. The house counselors generally have college degrees but not necessarily in any area having to do with children, they may have a B.A. in English, they may have a B.A. in journalism, something like that, but they have a college degree.
There are also aids [sic: aides] who have high school degrees who help with the kids. Because of the setup of Children's Home the people with the greatest amount of education have the least to do with the kids. The guy who runs the program with the Ph.D. doesn't have much hands-on experience. The people who have daily contact with the children are the high school graduates and the college graduates in areas other than child psychology or education of children or that kind of thing.

6. Defendants suggest balancing the harm which might befall plaintiffs with "the injury that granting the injunction would inflict on the defendants." Doc. 6 at 3, citing *Princeton Educational Association v. Princeton Board of Education*, 480 F.Supp. 962, 967 (S.D.Ohio 1979). While we rely instead on the Sixth Circuit's test for preliminary injunctive relief set forth in *Knebel*, 563 F.2d at 261, we do note that were we to utilize the balancing test suggested in *Princeton*, we would conclude that the potential for irreparable harm to plaintiffs outweighs the necessarily speculative injury that granting injunctive relief would visit upon defendants.

7. As we read the statute and regulations, however, and particularly 34 C.F.R. § 300.513 and the comment thereto, the "normal procedures" which the school can use are those which it would use in handling a disruptive child who is not covered by the EAHCA, with the exception of complete cessation of educational services, which we do not view as an appropriate disciplinary measure under the Act.

We find that the "substantial harm" factor is not sufficient to justify exclusion of plaintiffs from the classroom for extended periods of time. The parties should understand, and we hope that progress might be possible in helping the minor plaintiffs understand, that future disturbances will necessarily have some impact upon the equitable mix herein. While we "cannot disregard the possibility that [defendants'] handling of plaintiff[s] may have contributed to [their] disruptive behavior," *Stuart v. Nappi*, 443 F.Supp. 1235, the present record does not support such a finding except upon the general terms testified to by Dr. Cresci; we can only say that further outbursts will have to be considered as they come up, but cannot be discounted as being arguable grounds for modification of any preliminary injunction herein.

In light of the foregoing, we do find that the public interest will best be served by the issuance of a preliminary injunction in this case. We cannot overlook the fact that both Congress and the Supreme Court place great importance on the procedural provisions incorporated into § 1415. Of some significance, too, is the fact that although over 45 days have elapsed since plaintiffs were removed from class, the requested hearings regarding the appropriateness of defendants' actions have not been scheduled, much less concluded. *See* 34 C.F.R. § 300.512(a) ("The public agency shall insure that not later than 45 days after the receipt of a request for a hearing: (1) a final decision is reached in the hearing . . . .") Failure to order compliance with the Act would thus lend the Court's imprimatur to the very real possibility that the hearing process will not yield results until after the time set by defendants for returning plaintiffs to the classroom on a limited basis, a result which we cannot condone.

We therefore conclude that plaintiffs have met their burden of demonstrating that they are entitled to a preliminary injunction.

### V.

We will, if no better alternative can be generated, simply order that plaintiffs be returned to their classrooms. However, we do not perceive this as a situation in which time is absolutely of the essence, and we think the better course is to confer with counsel and representatives of the school in an attempt to arrive at a mutually agreeable form for the injunction herein to take. In particular, we are concerned that the record does not demonstrate that the minor plaintiffs are receiving any therapeutic treatment for their handicaps as part of their "appropriate free public education." It is reasonable to suppose that in the absence of such treatment, the problems leading to this lawsuit will simply resurface in relatively short order, and the parties and the Court will be back at square one. We are similarly concerned that while plaintiffs reside in what is, by all accounts, a remarkable facility, the record does not reflect that they are receiving therapeutic treatment, beyond evaluation, in the residential setting either. Our hope is that between the school system and the Home, an arrangement might be reached in which plaintiffs are both provided classroom instruction among their peers and provided with substantial psychological assistance. We note in this regard Mrs. Senior's comment that the parties—and now the Court —"are all in the children business" (Tr. 1 at 40): We are most concerned that Del and Lamont not serve as markers in an inter-agency squabble.

To this end, we will hold a conference in chambers on Wednesday, October 31, 1984 at 2:00 p.m. In the interim, counsel are asked to confer with their clients and between themselves with an eye toward working out a compromise which best serves the interests of these children. We also request that defendants reconsider their apparent unwillingness to consent to the presence of a court-appointed observer in the classroom. If no agreement can be reached, we may determine that additional evidence regarding an appropriate remedy is in order. We caution, however, that in the absence of a viable alternative which

appears to fulfill the terms of the Act and serve the needs of all involved, we will be constrained to order the minor plaintiffs' return to the classroom.

SO ORDERED.