P.T. GILLETTE, Jr., a minor By and Through his parents Paul and Susan GILLETTE, Plaintiffs,

v.

FAIRLAND BOARD OF EDUCATION, Defendant.

No. C-1-88-610.

United States District Court, S.D. Ohio.

Nov. 17, 1989.

**344**

Michael Mooney, Cincinnati, Ohio, for plaintiffs.

John Issenmann, Cincinnati, Ohio, for defendant.

## ORDER

CARL B. RUBIN, Chief Judge.

This matter is before the Court on cross-motions for summary judgment (Docs. No. 7 and 8). In accordance with Fed.R.Civ.P. 52, the Court does hereby set forth its findings of fact, opinion, and conclusions of law.

## FINDINGS OF FACT

(1) P.T. Gillette, Jr. (P.T.), whose date of birth is September 21, 1971, suffers from a learning disability (L.D.) known as dyslexia, and is a "handicapped child" as defined under The Education For All Handicapped Children Act ("Act"), 20 U.S.C. § 1401(a)(1).

(2) P.T. and his parents Susan and Paul Gillette reside within the jurisdiction of the Fairland Public School System in Proctorville, Ohio.

(3) Defendant Fairland Board of Education is the educational body charged with the responsibility of providing P.T. with an education.

(4) P.T. attended Fairland Middle School for the fifth and sixth grades during the 1982–83 and 1983–84 school years.

(5) At the close of the 1982–83 school year, P.T.'s parents requested an Impartial Due Process Hearing as a result of problems they perceived to be developing. A decision issued on May 20, 1983 following an impartial "due process" hearing held that the Fairland Public School System had failed to properly implement the Individualized Educational Program (IEP) prepared for P.T. for the fifth grade.

(6) Because P.T.'s parents believed the Fairland Public School System had failed to implement the IEP prepared for P.T. for both the 1982–83 and 1983–84 school years, they enrolled him at a private educational institution, The Phelps School, in Malvern, Pennsylvania for the 1984–85 and 1985–86 school years.

(7) P.T. returned to Fairland High School for the ninth grade during the 1986–87 school year.

(8) On May 13, 1987, Susan Gillette requested a "due process" hearing concerning whether defendant had complied with requirements of the Act and state law. She requested reimbursement of expenses incurred in enrolling P.T. at Phelps School. On July 10, 1987, the Independent Hearing Officer (IHO) set the hearing for August 13 and 14, 1987. The hearing was subsequently reset to August 17 and 18, 1987. On August 6, plaintiff's counsel contacted the IHO and requested a continuance of the hearing. The hearing was continued to November 3, 1987. The hearing eventually took place on February 1, 1988.

(9) The IHO issued a decision on May 31, 1988 in which he found that (1) a free appropriate public education had been provided to P.T. during the sixth and ninth grades; (2) an appropriate IEP was prepared for P.T. for the tenth grade; and (3) P.T.'s parents were not entitled to reimbursement of costs incurred in enrolling P.T. at Phelps School.

(10) On June 2, 1988, P.T. requested a state level review of the IHO's decision. The State Level Review Officer (SLRO) issued an order upholding the IHO's decision on August 31, 1988.

(11) An IEP for the tenth grade was presented to P.T.'s parents ten days before the start of the 1987–88 school year. P.T. returned to Phelps School that school year for the tenth and ensuing grades.

## OPINION

### APPLICABLE LAW

The Act provides federal money to assist state and local agencies in educating handicapped children. As a condition for receiving federal aid, a state must have in effect a policy that assures all handicapped children the right to a free appropriate public education (FAPE). 20 U.S.C. § 1412(1). "FAPE" is defined under the Act as special education and related services provided in conformity with the IEP required under 20 U.S.C. § 1414(a)(5). 20 U.S.C. § 1401(a)(18). A FAPE is an education that is sufficient to confer some educational benefit upon the handicapped child. *Rowley*, 458 U.S. at 200, 102 S.Ct. at 3047–48. "The basic floor of opportunity provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Id.* at 201, 102 S.Ct. at 3048. Such instruction and services must be provided at public expense, must meet the State's educational standards, must approximate the grade levels used in the State's regular education system, and must comport with the child's IEP. *Id.* at 203, 102 S.Ct. at 3049.

The IEP is a written statement for each handicapped child developed in a meeting by an educational unit representative who shall be qualified to provide or supervise specially designed instruction to meet the unique needs of handicapped children. 20 U.S.C. § 1401(a)(19). The IEP must include a statement of the child's present level of educational performance, annual goals, the services to be provided the child, the extent to which the child will be able to participate in regular educational programs, dates for initiation and duration of such services, and appropriate objective criteria, evaluation procedures, and schedules for determining on at least an annual basis whether instructional objectives are being achieved. *Id.* The state must insure that school officials will establish or revise an IEP for each handicapped child with participation by the child's parents or guardian at the beginning of the school year. 20 U.S.C. § 1414(a)(5). School officials must review, and if appropriate, revise the IEP's provisions at least annually. *Id.*

Title 20 U.S.C. § 1415 establishes procedural safeguards that a state or local educational agency must provide. These include an opportunity for a handicapped child's parents or guardian to inspect relevant records and to obtain an independent educational evaluation of the child; written prior notice to the parents or guardian whenever the agency proposes to or refus-

es to initiate or change the identification, evaluation or educational placement of the child or the provision of a FAPE; and an opportunity to present complaints with regard to relevant matters. 20 U.S.C. § 1415(b)(1). If a parent or guardian presents a complaint, he shall have an opportunity for an impartial "due process" hearing to be conducted by the state or local educational agency or intermediate educational unit. 20 U.S.C. § 1415(b)(2). If the hearing is conducted by the local or intermediate agency or unit, any party aggrieved by the decision may appeal to the state educational agency which shall conduct an impartial review of such hearing. 20 U.S.C. § 1415(c). A party may bring a civil action in state court or the United States District Court if aggrieved by the decision of the state educational agency. 20 U.S.C. § 1415(e)(2).

In resolving a claim under the Act, the court shall receive the records of the administrative proceedings, hear additional evidence at the request of a party, and grant such relief as the Court deems appropriate. *Id.* The Court must undertake a *de novo* review but give due weight to state administrative proceedings. *Roncker on Behalf of Roncker v. Walter,* 700 F.2d 1058, 1062 (6th Cir.1983), *cert. denied,* 464 U.S. 864, 104 S.Ct. 196, 78 L.Ed.2d 171 (1983). The Court's *de novo* review consists of a two-step inquiry: (1) has the state complied with the Act's procedural requirements, and (2) is the IEP reasonably calculated to enable the child to receive educational benefits. *Hendrick Hudson Dist. Bd. of Ed. v. Rowley,* 458 U.S. 176, 206–07, 102 S.Ct. 3034, 3050–51, 73 L.Ed.2d 690 (1982). The Court must give greater deference to the state's placement decision if the Act's procedural requirements have been met. *Roncker,* 700 F.2d at 1062 (citing *Rowley,* 458 U.S. 176, 102 S.Ct. 3034). Once the Court determines that the Act's requirements have been satisfied, questions of methodology are for resolution by the state. *Rowley,* 458 U.S. at 208, 102 S.Ct. at 3051–52.

Congress has indicated a very strong preference for "mainstreaming", or educating handicapped children with children who are not handicapped. *Roncker,* 700 F.2d at 1062. Section 1412(5) requires that to the maximum extent appropriate, handicapped children must be educated with children who are not handicapped. Removal of handicapped children from the regular educational environment should occur only where the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily. 20 U.S.C. § 1412(5). In some cases, a placement which may be considered better for academic reasons may not be appropriate under the Act because such placement fails to provide for mainstreaming. *Roncker,* 700 F.2d at 1063.

When devising an appropriate program for individual students, cost concerns are legitimate. *Id.; Clevenger v. Oak Ridge School Bd.,* 744 F.2d 514, 517 (6th Cir. 1984). However, costs may be taken into consideration only when choosing among several appropriate education options. *Clevenger,* 744 F.2d at 517. When only one alternative for an appropriate education is available, the state must follow that alternative irrespective of the cost. *Id.*

Ohio law parallels the Act in pertinent respects. It requires that handicapped children of compulsory school age be provided an appropriate public education; that handicapped children be educated with nonhandicapped children to the maximum extent appropriate; and that the procedural safeguards enumerated under 20 U.S.C. § 1415 be provided. Ohio Revised Code Ann. §§ 3323.02, et seq.

## FAPE IN THE FIFTH AND SIXTH GRADES

Plaintiff contends that the second prong of the *Rowley* standard was not met during P.T.'s fifth and sixth grades in that his education was not conferring a benefit on him during that period. P.T.'s parents requested a "due process" hearing in connection with P.T.'s fifth grade education. The IHO determined that the IEP prepared for P.T.'s fifth grade education was never used as a working document and that the school

had not complied with the Act's requirement. That determination is not contested in this litigation and is therefore binding on this Court.

Susan Gillette gave the following testimony regarding P.T.'s sixth grade education at the "due process" hearing held during P.T.'s tenth grade of school. Although the regular classroom teacher, Michael Allen, was performing commendably, the L.D. teacher, Greg Michaels, was not. (TI–66, 72).[1] Portions of the IEP were not followed. Specifically, the token economy system that had been established was not being implemented (TI–63); P.T. was not receiving help in discovering outlets in which he could find pleasure and success; weekly conferences between P.T.'s parents and teachers were not held and data charts were not completed; P.T. was not tested to see if he was answering questions with 75% accuracy; and P.T.'s school work was not shown to his parents. In addition, Greg Michaels was unable to document what he was doing in class; a reading program requested by Susan Gillette and certain school officials was not obtained; and there was no structure in Greg Michaels' classroom. (TI–63, 66, 67, 68, 70, 78, 85). P.T. began to develop behavior problems outside of school (TI–70; TII–55–59). Other individuals testified that Greg Michaels was not a particularly effective L.D. teacher and did not have a great deal of experience. (TI–129, 133).

Susan Gillette further testified as to portions of the IEP that were followed. She testified that things or activities were not withheld from P.T. because of poor school work; P.T. was permitted to use a calculator in simple math; tests were adminis-

tered orally to P.T. by the L.D. teacher; P.T.'s natural creativity was fostered by an art teacher who worked with him "quite a bit"; P.T. was not assigned any homework that he could not complete by himself; and P.T.'s instructional reading and english group consisted of no more than four students. She also testified that P.T.'s parents met with his teachers every six weeks and that Greg Michaels had indicated he was meeting with P.T.'s regular teachers on a weekly basis. (TI–66, 82–89) Michael Allen testified that he and Greg Michaels conferred about P.T. almost daily. (Final Order of SLRO, citing TIII–74–75).

The IHO found from the testimony and school records admitted into evidence that P.T.'s grades in the fifth and sixth grades were not "spectacular", but were sufficient to enable P.T. to pass and advance to succeeding grades. He concluded that P.T. had been offered a FAPE at all relevant times. The SLRO determined that a significant part of P.T.'s IEP for the sixth grade was followed by the educators involved and that access to a FAPE was provided to P.T.

■ Upon review of the record, the Court finds that a FAPE was provided to P.T. in the sixth grade. Although the testimony at the "due process" hearing demonstrates that portions of the IEP were not followed, the undisputed testimony also supports the SLRO's determination that significant provisions of the IEP were followed. Such testimony, including those portions of Susan Gillette's testimony submitted to the Court, does not distinguish between the early and latter parts of the school year.[2] Furthermore, P.T. was able to achieve satisfactory grades and to advance to the seventh grade.[3] Overall, the

1. "TI", "TII", "TIII" and "TIV" refer to the volumes of the transcript of the "due process" hearing.

2. Susan Gillette testified to a deterioration in P.T.'s behavior over the course of the school year, but did not indicate that those portions of the IEP which she testified school officials had followed were not adhered to during the latter part of the school year.

3. When a child is being educated in regular classrooms, whether the child is achieving passing grades and advancing to succeeding grade

levels are important factors in determining whether educational benefit is being conferred. *Rowley,* 458 U.S. at 207 n. 28, 102 S.Ct. at 3051 n. 28. A handicapped child who is advancing from grade to grade in a public school system is not necessarily receiving a free appropriate education. *Id.* at 203 n. 25, 102 S.Ct. at 3049 n. 25. Although this is a positive indication of educational benefit, the Court must look at the facts of the case before it in order to determine whether the IEP is reasonably calculated to enable the child to receive educational benefits. *Id.*

Court concludes that the sixth grade education program testified to was reasonably calculated to enable P.T. to receive educational benefit.

■ In addition, the Court notes that P.T.'s parents did not request a "due process" hearing with regard to P.T.'s sixth grade education before enrolling him at Phelps for the seventh grade. Nor did P.T.'s parents comply with school officials' request to discuss an IEP for P.T.'s seventh grade. Moreover, P.T.'s parents have stated that they did not complain about their son's sixth grade education during that school year because they did not want to antagonize school officials and because they felt their complaints would not make a difference. Had P.T.'s parents voiced their complaints and requested a "due process" hearing, they may have obviated the need for their expenditures for P.T.'s seventh and eighth grade education. In view of their failure to take available action, it would be speculation to conclude that defendant would not have provided P.T. a FAPE in the seventh and eighth grades. Accordingly, P.T.'s parents are not entitled to reimbursement for his tuition and school expenses incurred at Phelps during the seventh and eighth grades.

TENTH GRADE IEP

Plaintiff claims that defendant failed to offer him a FAPE for the tenth grade because the school denied him an acceptable amount of mainstreaming. The issue thus presented is whether defendant satisfied the Act's requirement that P.T. be educated alongside non-handicapped children to the maximum extent appropriate. *Roncker,* 700 F.2d at 1062.

In resolving this issue, the Court must first determine whether the Act's procedural requirements have been satisfied. Plaintiff claims that defendant failed to comply with the requirement that a child's parents or guardian be given an opportunity to participate in the formulation of a child's education plan by waiting until August, 1987 to present an IEP for the 1987–88 school year to P.T.'s parents. The Court disagrees. There apparently were delays in formulating an IEP due to various participants' vacations and scheduling conflicts. Nonetheless, P.T.'s parents did meet with school officials in August, 1987, and participated in formulation of the proposed IEP. Plaintiff's counsel, on behalf of P.T.'s parents, responded to the proposed IEP on September 2, 1987 (the "Mooney letter"). School officials subsequently met to discuss the points raised in the letter and responded thereto on September 24, 1987 (the "Meyers letter"). In their response, school officials expressed agreement with some of plaintiff's proposals but disagreed on one major point: whether P.T. should be educated in a regular classroom and receive assistance from the L.D. teacher, or whether he should be educated primarily in an L.D. classroom but attend a limited number of classes in the regular classroom. Apparently before any further discussions between P.T.'s parents and school officials ensued, and without notice to the school district, P.T.'s parents withdrew him from Fairland High School and enrolled him at Phelps for the tenth grade.

■ The late presentation of the IEP hampered efforts to resolve conflicts over P.T.'s educational program prior to the beginning of the tenth grade. Nonetheless, P.T.'s parents were given an opportunity to participate in the formulation of the proposed IEP and to raise objections to the proposal. School officials considered and responded to those objections. Thus, the Act's procedural requirements were essentially satisfied.

The IEP placed P.T. in the school's regular education program for physical education, health, projects and math skills. P.T. was to attend L.D. classes in language arts, reading, science, study skills and social studies. At the "due process" hearing conducted in February 1988, several school officials and experts expressed their opinions on the proposed IEP and whether a greater degree of mainstreaming was appropriate in P.T.'s case. Thomas Brooke, a psychologist for the Lawrence County, Ohio Schools, opined that the L.D. teacher could have taught reading and written expression to P.T. and worked with the regu-

lar classroom teachers on the remaining subjects and modified those classes to accommodate P.T. (TI–188–90). Brooke testified that the proposals outlined in the Mooney letter were factors that the school had wanted to follow at the beginning of the year, but that P.T.'s parents were adamant at that time that the L.D. teacher not work with P.T. at all. (*Id.*).

E.G. Necco, Ed.D., Professor of Special Education at Marshall University, testified that he was "basically comfortable" with the proposals in the Mooney letter and the response of the school officials. (TI–133). He expressed some reservation about defendant's emphasis on an L.D. core placement. Dr. Necco testified that he would have not stressed an L.D. core placement so extensively, but would have also stressed "... collaborative mainstream placement with receptive regular, class teachers and ... support ... concerning materials, pedagogy, curriculum adjustment ..." (*Id.*)

William Nestor, a history and government teacher at Fairland High School, testified that it would be "impossible" to accommodate P.T.'s needs in a regular classroom setting with twenty-five to thirty-five students. He testified that a teacher could not give P.T. the time he required without taking from the other students. (TIII–136).

Fairland High School Principal David Judd testified that P.T. could not obtain as good an education in a regular classroom as he could in the L.D. classroom composed of three to four students. He perceived little difference between the proposed IEP and the points raised in the Mooney letter. (TIV–267)

Ronald Sims, a school psychologist retained by P.T.'s parents to perform an evaluation of P.T. in 1983, suggested in his report that P.T. participate in an L.D. program and not be mainstreamed except in those areas where he could prove successful, such as art, music and physical education. Sims stated that some consideration could be given to allowing P.T. to participate in regular classes for social studies and science if special arrangements could be made.

There appears to be no dispute among the experts and school officials that the IEP devised for P.T. for the tenth grade would have provided him with an appropriate public education, and the Court so finds. Given this premise, the Court must determine whether the IEP nonetheless satisfied the Act's mainstreaming provisions.

The SLRO determined that the specialized instruction P.T. requires cannot feasibly be provided in a non-segregated setting because it would impose a large administrative burden on regular teachers and require them to spend an inordinate amount of time on one student. The IHO noted that P.T. was enrolled in the regular curriculum at Fairland High School for the ninth grade at the request of his parents. However, P.T.'s parents were dissatisfied with the education he received that year, having felt that the system broke down in December of the school year· when the coordinator became ill. He concluded that P.T. would benefit from an L.D. program with mainstreaming as his abilities and interests dictated. The IHO found that if P.T.'s parents agreed to permit him to attend Fairland High School for the 1988–89 school year, an IEP should be drafted placing P.T. in the L.D. program, with mainstreaming as appropriate, taking into account the factors listed in the Mooney and Meyers letters.

The Court must give due weight to these administrative findings. Nonetheless, the Court is not bound by the conclusions of the administrative review officers as to the appropriateness of the IEP prepared for P.T. for the tenth grade. The experts who testified at the "due process" hearing were essentially in agreement that P.T. could be placed in a regular classroom with modifications and that such educational program could by coordinated by the L.D. teacher, who would teach P.T. in the areas of reading and writing. The primary concern with this educational program was that expressed by Mr. Nestor, who testified as to the administrative burden which

would be placed on the teachers and the effect that administering such a program would have on the other students. However, the administrative burden imposed by educating a handicapped child together with non-handicapped children cannot overcome the strong Congressional preference for mainstreaming, absent evidence the handicapped child would not benefit from mainstreaming; that the benefits to be gained from instruction in a segregated setting far outweigh the benefits to be received from mainstreaming; or that the child would be a disruptive force in a non-segregated setting. See *Roncker*, 700 F.2d at 1063. Such evidence is lacking in this case. To the contrary, the record shows that P.T. was educated in a regular classroom for the ninth grade and received passing grades. There is no evidence that the administrative burden entailed by mainstreaming P.T. that year was too great for the school district to bear, that accommodating P.T.'s needs in the regular classroom deprived other students of needed attention, or that P.T. did not derive sufficient benefits from mainstreaming. Furthermore, there is no evidence that excessive or even additional costs would be incurred by mainstreaming P.T. Accordingly, the Court finds that the IEP prepared for P.T. for the tenth grade does not satisfy the requirements of 20 U.S.C. § 1412(5) because it fails to provide for an appropriate amount of mainstreaming.

### RELIEF

The Act directs the Court to grant such relief as it deems appropriate. 20 U.S.C. § 1415(e)(2). An issue remains as to what relief is appropriate under the facts of this case.

Pursuant to 20 U.S.C. § 1415(e)(3), a handicapped child shall remain in his then current educational placement pending the outcome of proceedings conducted under that section unless the State or local educational agency and the parents or guardian otherwise agree. However, a parent who believes his child is receiving an inappropriate education from a local educational agency may take unilateral action to change the child's placement during the pendency of administrative processes. *Lamont X. v. Quisenberry*, 606 F.Supp. 809 (S.D.Ohio 1984) (Porter, Sr. J.).

In certain cases, parents may obtain retroactive reimbursement for tuition and related services provided to a child who the parents have privately placed in a particular school. *Burlington School Comm. v. Mass. Dept. of Ed.*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). A parent does not waive his right to such reimbursement by unilaterally changing his child's placement while review proceedings are pending. *Id.* However, if the Court ultimately determines that the IEP proposed by school officials was appropriate, parents are barred from obtaining reimbursement for any interim period in which their child's placement violated § 1415(e)(3). *Id.* at 373–74, 105 S.Ct. at 2004. Thus, parents who unilaterally change their child's placement during the pendency of review proceedings do so at their own financial risk. *Id.*

In order to establish a right to reimbursement, two requirements must be met. First, the private placement desired by the parent must be proper under the Act. Second, the IEP calling for placement in a public school must have been inappropriate. *Id.* at 370, 105 S.Ct. at 2002.

The IHO stated that it was his opinion as well as that of all parties concerned that Phelps is a quality school which is providing a quality education to P.T. However, defendant contends that plaintiff has failed to establish the need for P.T. to attend a private school and questions whether alternative private placements were available to P.T.

■ Once defendant failed to offer a FAPE to P.T., it became the parents' burden to find a school that would offer an appropriate education. The record before this Court is devoid of any evidence which would suggest that Phelps has failed to provide such an education to P.T. Similarly, there is absolutely no evidence which indicates that less expensive alternative placements were available to P.T. Thus,

the two requirements for reimbursement set forth in *Burlington* have been met.

 The Court notes that P.T.'s parents failed to consult or advise defendant regarding its intention to enroll P.T. at Phelps for the tenth grade. However, the Court further notes that because an IEP for P.T.'s tenth grade was not presented to his parents until August preceding that school year, sufficient time in which to devise an appropriate IEP as requested by the parents before the start of the school year was not available. Moreover, the school indicated in the Meyers letter its unwillingness to accommodate the parents' mainstreaming request. Thus, P.T.'s parents had the option of enrolling him at Fairland High School where he would not be receiving an appropriate amount of mainstreaming, or unilaterally changing his placement to a school where he would be sufficiently mainstreamed. Under the circumstances, P.T.'s parents' failure to consult school officials regarding an alternative placement does not deprive them of their right to reimbursement.

P.T.'s parents request reimbursement for expenses incurred during P.T.'s tenth grade and thereafter until defendant offers P.T. an IEP which satisfies the Act. P.T. is now in the twelfth grade. Assuming defendant would be able to offer him an appropriate IEP for the remainder of the twelfth grade, it would not be feasible to require P.T. to enroll at Fairland High School at this juncture. Therefore, plaintiffs are entitled to reimbursement for the costs of P.T.'s tenth, eleventh and twelfth grade education at Phelps. Reimbursement shall be limited to tuition and room and board for those years.

## CONCLUSIONS OF LAW

(1) P.T. Gillette was provided a free appropriate public education during the sixth grade at Fairland Middle School.

(2) Susan and Paul Gillette are not entitled to reimbursement for expenses incurred in educating P.T. at Phelps in the seventh and eighth grades.

(3) Defendant failed to offer P.T. a free appropriate public education for the tenth grade in that the proposed IEP did not provide for the maximum amount of mainstreaming appropriate.

(4) Susan and Paul Gillette are entitled to reimbursement for amounts expended for tuition and room and board during P.T.'s tenth, eleventh and twelfth grades of schooling at Phelps. Plaintiff is hereby ordered to submit to the Court, within twenty days, an itemized statement setting forth the amounts the Gillettes have paid or are obligated to pay for tuition and room and board for those school years.

IT IS SO ORDERED.